**MONOLITH PORTLAND MIDWEST COMPANY, a corp., Plaintiff,**

v.

**RECONSTRUCTION FINANCE CORPORATION, a corporation, Defendant.**

No. 11816.

United States District Court, S. D. California, Central Division.

Jan. 20, 1955.

830

Joseph T. Enright, Norman Elliott, Gibson, Dunn & Crutcher, Henry F. Prince, William French Smith and Richard E. Davis, Los Angeles, Cal., for plaintiff.

Lillick, Geary & McHose, Allan E. Charles, Frank Adamson, William A. C. Roethke, Lyon & Lyon and Earl L. Martin, Los Angeles, Cal., for defendant.

JAMES M. CARTER, District Judge.

There is presented here the question of the application of the Contract Settlement Act of 1944, c. 358, 58 Stat. 649; 41 U.S.C.A. §§ 101–125, hereinafter called the Settlement Act, and the War Mobilization and Reconversion Act of 1944, Act Oct. 3, 1944, c. 480; 58 Stat. 785; 50 U.S.C.A.Appendix §§ 1651–1678, hereinafter called the Reconversion Act, to a War contract terminated on September 10, 1946, and the war contractor's claim for monetary compensation.

Plaintiff, Monolith Portland Midwest Company, hereinafter called Monolith, is a corporation organized under the laws of Nevada, and doing business in California and Wyoming. For more than twenty years, it has owned, operated and maintained a cement manufacturing plant located at Laramie, Wyoming. A second corporation, Monolith Portland Cement Company, is the parent corporation and is not involved herein, except that it appears as one of the parties to the second Licensing Agreement signed April 18, 1944.

The Defense Plant Corporation, hereinafter referred to as D.P.C. was organized on August 22, 1940, pursuant to Act of Congress, Act June 25, 1940, 54 Stat. 572, 6 FR 2970, amending the R.F.C. Act of Jan. 22, 1932, c. 8, 47 Stat. 5, as amended, 15 U.S.C.A. §§ 601–617, as amended, and specifically § 5d thereof. All the stock of D.P.C. was at all times owned by the defendant, R.F.C. On July 1, 1945, D.P.C. was dissolved by Act of Congress, Act of June 30, 1945, c. 215, 59 Stat. 310. Pursuant to the Act, the R.F.C. succeeded to and assumed all the rights, duties and obligations of the D.P.C.

The R.F.C. is in the process of liquidation, R.F.C. Liquidation Act of 7/30/53; P.L. 163, 83rd Congress, c. 282. By Section 105 thereof actions do not abate, and substitutions may be made.

### THE PRIOR DECISIONS IN THE CASE.

The first Contract involved was dated June 1943, and since termination on September 10, 1946, the matter has been in litigation almost continuously to this date. This court has tried the case on the merits, in trial lasting three months, and it has been the purpose of the court and counsel that in the event of further proceedings, the record made will not have to be duplicated.[1]

An action was first filed in the Superior court on November 7, 1946, was removed to the District court and was dismissed by judgment dated January 25, 1949 (unreported) generally on the ground that Monolith had not exhausted its administrative remedies under the above Acts. That judgment was affirmed on appeal in Monolith Portland Midwest Company v. Reconstruction Finance Corporation, 9 Cir., 1949, 178 F.2d 854, certiorari denied Apr. 10, 1950, 339 U.S. 932, 70 S.Ct. 668, 94 L.Ed. 1352; rehearing denied May 8, 1950, 339 U.S. 954, 70 S.Ct. 839, 94 L.Ed. 1367.

On June 16, 1950, Monolith filed the present action in the Superior court. It was removed to this court on June 26, 1950. Thereupon the defendant (hereinafter referred to as R.F.C.) filed motions to dismiss or for summary judgment. This court denied the motions on the

---

1. See Point II.

ground that a claim for relief had been stated under the Settlement Act, but struck certain portions of the complaint that sought and spoke of, damages for breach of contract and injunction. This court's opinion on such motions is reported in Monolith Portland Midwest Company v. Reconstruction Finance Corporation, D.C.S.D.Cal.1951, 95 F.Supp. 570.

Thereafter, Monolith requested a jury trial and R.F.C. moved to strike the request. This court denied a trial by jury and its opinion thereon is reported in Monolith, etc., Co. v. R. F. C., D.C.S.D. Cal.1952, 102 F.Supp. 951.

The case was tried beginning November 5, 1952, and ending February 20, 1953. Extensive printed briefs were filed from May to August 1953. Thereafter the matter was argued in October 1953.

## A.
## THE FACTUAL BACKGROUND

(1) The Contracts; Plancor 1844

Five contracts were entered into between D.P.C. and Monolith and represent the project called Plancor 1844.

### (a) The Licensing Agreements.

Two of these contracts dated June 28, 1943, and April 18, 1944, were licensing agreements. By the contract of June 28, 1943, Monolith granted D.P.C. and any operator of a proposed alumina plant, a non-exclusive right and license (a) to use only in the plant and to make and sell products produced therein through information disclosed by Monolith, and (b) *to use only in the plant* and to make and sell all products covered by U. S. Letters Patent, then or thereafter issued, owned or controlled by Monolith, relating to Monolith's processes for producing alumina.

The second licensing agreement dated April 18, 1944 was a longer contract, joined in by Monolith Portland Cement Co. (the parent company) spelling out more specifically a royalty free, non-exclusive, irrevocable and continuous license to D.P.C. for a production of alumina and by-products in the proposed plant at Laramie, Wyoming, using Monolith's patents and processes and *an option to acquire rights and licenses for any and all additional plants;* that the license was to be royalty free for the period of the national emergency and thereafter subject to a fair and reasonable royalty to be determined by negotiation. If such an agreement was not negotiated, the matter was to be subject to arbitration. Article V provided "that any abandonment by Defense Corporation of the project referred to in the Operating Agreement prior to its completion and attempted operation as defined in the Operating Agreement, will terminate any rights of Defense Corporation acquired under Article II of this agreement." (Article II referred to the license, and options for additional licenses.) Further reference will be made to these license agreements, if and as they become necessary in this opinion.

### (b) The "A & C" and "M & O" Contract.

The remaining three contracts, the original dated June 28, 1943; an amendment thereof dated August 26, 1944 and a further amendment dated September 28, 1944, were commonly referred to as the *"Acquisition and Construction"* and *"Management and Operation"* agreements. Hereafter they will be referred to as the "A & C" and the "M & O" agreements. They were agreements between Monolith and D.P.C. in which the parent company did not join.

The original "A & C" and "M & O" agreement of June 28, 1943 recited that the production of alumina for the government, and the expansion of capacity for such production was in the interests of the national defense program, and that the War Department "has advised that the establishment of facilities for such production in the vicinity of Laramie, Wyoming, having a daily productive capacity of approximately sixty (60) to seventy-five (75) tons of alumina, and the acquisition of machinery and equipment for use in such production * * * are in its opinion necessary to the inter-

ests of national defense." The agreement was then divided into two parts, Title I concerned "Construction and Acquisition" of the plant and necessary lands and facilities and Title II was entitled, "Management and Operation of the Plant."

The "C & A" portion provided that Monolith would assist D.P.C. in the acquisition of sites for facilities and sites and options on sites containing deposits of anorthosite, and in the acquisition of all necessary patents or licenses and contracts for water, power and other utilities. Monolith agreed to submit to D. P.C. plans and specifications and schedules for the construction of the plant, and for the acquisition and installation of machinery. Monolith was designated as the contractor and was to employ other contractors with the approval of D.P.C. D.P.C. was to advance the funds necessary for carrying out the construction program, and to pay for machinery necessary.

Section Nine of the "A & C" provided that as compensation for Monolith's services in the acquisition of sites and options, and the supervision of the construction of the plant, D.P.C. would pay Monolith a fee of 1% of D.P.C.'s actual expenditures, not to exceed $38,885 in lieu of executive salaries and other costs, charges and expenses of the "A & C" program. It was originally contemplated that the plant would cost approximately $3,885,000. Title to all sites, options, buildings and machinery were to remain vested in D.P.C.

Title II, the "M & O" program provided in Section Twelve, "Beginning with the readiness of the plant or any part thereof for operation, as certified to Defense Corporation by Contractor (Monolith) and approved by Defense Corporation, or as certified by Defense Corporation to Contractor," Monolith

was to manage and operate the plant, including the mining of the anorthosite and the transportation of raw materials, as an independent contractor for D.P.C., hiring all necessary employees.

D.P.C. agreed to reimburse Monolith for the costs of management and operation. D.P.C. agreed also to pay to Monolith as a fee for management and operation, and the sale of the products, $1.50 per ton on all salable alumina produced in the plant, but in no event should such fee be less than $6,000 for each year that the provisions of the contract "beginning with the readiness of the plant or any part thereof for operation," were in force. From such date, the M & O provisions were to be in force for ten years.

D.P.C. or Monolith could "cancel this agreement at any time after the expiration of sixty (60) days from the date of the completion of the plant and its readiness for operation, upon giving thirty (30) days written notice to the other."

D.P.C. agreed that it would not sell the plant while this agreement was in force, and for a period of six months thereafter, except in the event of a cancellation pursuant to paragraph 27,[2] to any other party other than Monolith unless it first offered the plant to Monolith on the same terms and conditions equal to the best offer received by D.P.C.

Monolith was to sell and dispose of the alumina and other products, pursuant to the direction of and for the account of D.P.C. Title to all property acquired was to be vested in D.P.C.

The Amendment of August 26, 1944 to the "C & A" & "M & O" Contract.

The amendment of August 26, 1944, recited that Monolith advised that the $3,885,000 was insufficient to cover the materials and services for the project and requested that the amount be increased by $417,648. The amendment

2. This cancellation provision is not material as to what happened thereafter. It provided for a cancellation, (a) in the event of Receivership, Bankruptcy, Assignment for creditors or Reorganization of Monolith; (b) for violation of the terms of the agreement and failure on the part of Monolith to cure violation within 30 days after notice, and (c) in the event the plant was not substantially constructed in conformity with the plans, designs and specifications.

struck Sections Nine and Ten from the Agreement of June 28, 1943 and substituted new Sections Nine and Ten. The new Section Nine provided, "No salaries of Contractor's (Monolith's) executive officers, no fees of its attorneys, no part of the expense incurred in conducting Contractor's offices and no overhead expenses of any kind shall be included in the costs of the sites or options on sites or of the Program, except that direct expenses (including salaries) of Contractor's officers or employees and fees of attorneys retained or employed by Contractor in connection with the acquisition of the sites or options on sites and the Programs may be so included to the extent approved by Defense Corporation; provided, however, that any costs or expenses incurred since January 1, 1943, by or on behalf of Contractor in anticipation of and prior to the execution of this agreement, which, if incurred after the execution of this agreement, would have been allowable hereunder, shall, upon approval by Defense Corporation, be paid direct by Defense Corporation or be reimbursed to Contractor." New Section Ten provided that the maximum amount of expenditure shall not exceed $4,302,648. Thus, the provision for the 1% "A & C" fee, in lieu of salaries, was eliminated from the agreement.

Amendment of September 28, 1944 to the "A & C" & "M & O" Contract.

The amendment of September 28, 1944, recited that Monolith had advised that the $4,300,000 figure was insufficient to cover construction of buildings at the quarry, for mining and hauling equipment and for additional labor costs, and requested the amount be increased by an additional $336,400. Accordingly, Section Ten was stricken and a new Section Ten substituted, providing that the expenditure by D.P.C. should not exceed $4,639,048.

3. D.P.C. paid for the site.

4. A balance claimed due by Monolith is

(2) The Construction of the Plant.

Pursuant to these contracts, D.P.C. acquired a site from Monolith[3] at Laramie, Wyoming and thereon was built a plant having a planned capacity of 60–75 tons of alumina per day.

Although not spelled out in the contracts, the gist of the Monolith process was that alumina could be made from anorthosite and the residue could be used for the manufacture of cement, and accordingly the plant was built on a site adjacent to Monolith's cement plant at Laramie, Wyoming. The alumina plant and the cement plant, although independent units, were to be connected by an overhead conveyor belt for raw materials, whose grinding and screening and original sintering (burning) would be done in the alumina plant; and were to be connected by an underground system of pipes to carry the slurry (a mixture of the residue and water) back to the cement plant for further sintering.

The plant was nearly completed by July of 1946. The government, through D.P.C. and R.F.C. paid for the cost of the material, labor and the construction of the plant.[4] One unit of the plant, the laboratory, was put into operation prior to July of 1946, and Monolith called into play the provisions of the "M & O" contract, providing for the minimum payment of $6,000 per year for Management and Operation, and received sums of money on this account.

(3) The Stopwork & Termination Notice.

Under date of July 24, 1946, A. T. Hobson, Secretary of the R.F.C., wired the President of Monolith as follows:

"The Operation of the Facilities covered by the Operating Agreements Between Defense Plant Corporation and Your Company Under Plancor 1844 Were Not Terminated upon Cessation of Military Hostilities by Reason of the Finding of the Director of War Mobilization and

included within the portion of Monolith claim referred to as "reimbursables."

Reconversion Under Section 202 of the War Mobilization and Reconversion Act of 1944 That the Continuation of the Operation of said Facilities Would Benefit the Government. The Director of War Mobilization and Reconversion Has Now Found that It is In the Best Interest of the Government to Effect the Termination of the Operating Agreement Between DPC and Your Company at the Earliest Practical Date, Placing and Holding the Facilities in Standby Condition in Order to Afford an Opportunity to the Bureau of Mines to Obtain Congressional Sanction for the Use of the Plants for Further Experimentation and to Obtain Appropriations in Connection Therewith.

"Accordingly, at This Time You are Advised That all Work on the Acquisition and Construction Program and the Operating Program Will be Stopped Immediately Except as Stated Below * * *".

The exceptions concerned additional processing for reasons of safety, to avoid damage to equipment, and the completion of items which were substantially complete; arrangements to place the facilities on a standby condition, and renewal of utility contracts. The wire wound up with the following sentence: "This is a Stopwork Notice Only and Should Not be Construed as a Notice of Termination of Your Operating Agreement."

On September 10, 1946, R.F.C. by Leo Nielson, Assistant Secretary, wrote Monolith by registered mail, stating in part:

"The War Department has advised that the facilities included under the captioned Plancor are no longer required for production for the Government, and the Director of War Mobilization and Reconversion has directed this Corporation to terminate the aforesaid Agreement dated June 28, 1943, as amended; therefore, this Corporation (as successor to Defense Plant Corporation) hereby gives Notice of Cancellation of the aforesaid Agreement, as amended, effective thirty (30) days after the receipt of this Notice of Cancellation by your Company."

### (4) The First Action.

On November 7, 1946, Monolith filed in the State court, its prior complaint for damages. The action was removed to the U. S. District court and dismissed on January 25, 1949, for failure of Monolith to exhaust its administrative remedy under the Contract Settlement Act. The judgment of dismissal was affirmed on December 21, 1949 in the Monolith case, supra, 178 F.2d 854. On April 10, 1950, the United States Supreme court denied certiorari, 339 U.S. 932, 70 S.Ct. 668, 94 L.Ed. 1352, and on May 8, 1950, denied a rehearing, 339 U.S. 954, 70 S. Ct. 839, 94 L.Ed. 1367.

### (5) Monolith's Claims filed with R.F.C.

Meanwhile, on January 16, 1950, Monolith instituted its proceedings for administrative findings by letter, offering to settle the dispute and requesting findings on various matters and setting up the monetary[5] claims No. 1 to No. 5 referred to hereafter and set forth in its claim filed with R.F.C. under subdivisions No. 4B1 to No. 4B5 inclusive.[6] Monolith filed a certification to its claim on May 12, 1950.

Monolith's monetary claims may be summarized as follows: No. 1—(4-B-1)

5. Monolith made other claims to R.F.C. No. 1, The Contract was not a war contract; No. 2, That the stopwork order of 7/24/46 was a termination of the contract; No. 3, That filings of claims from time to time for reimbursables and letters of protest to the stopwork order, apparently constituted the filing of a claim under the Contract Settlement Act; No. 4(a) A conglomeration of miscellaneous requests other than monetary; No. 4(b) (1) to (5) the monetary claims.

6. Reference numbers to the claims by Monolith and to the numbers of the findings and determinations made by R.F.C. will be made from time to time for easy reference to the R.F.C. administrative file.

for the sum of $635,381.26 "for expenditures made in acquiring properties and for the partial construction of the plant at Laramie, Wyoming, and for its protection, legal and otherwise, and its maintenance and preservation," together with interest at 7% per annum on the claim. No. 2—(4–B–2) $600,000 to complete the plant; No. 3—(4–B–3) $1,500,000 to operate the plant for a reasonable test period; No. 5—(4–B–5) asks, in the event the "partially completed plant is not made available for testing the process, a claim in the sum of $7,500,000" apparently to construct a substitute plant and to run the test; No. 4—(4–B–4) interest at 7% on the other four items claimed.

(6) R.F.C.'s Findings & Determinations.

By stipulation R.F.C.'s time for making findings and determinations was on April 13, 1950 extended to June 17, 1950. On June 7, 1950, R.F.C. made and served on Monolith detailed findings and determinations pursuant to Section 13 of the Settlement Act, 41 U.S.C.A. § 113. R.F.C. found that no money was due to Monolith on any of the claims, except No. 1 (4–B–1) (referred to herein as the "Reimbursables") on which $109,322.49 was found due to Monolith plus interest at 2½% per annum (or $7.49 per day) from April 10, 1950 to June 7, 1950, the date of the findings.

The findings and determinations are detailed and comprehensive. In addition to its findings on claim No. 1(4–B–1) the "Reimbursables" and claim No. 4(4–B–4) Interest, each of which we consider in detail later, the R.F.C. found the facts in detail and concluded as follows:

Claim No. 2(4–B–2) (Finding D–13) " * * * that the amount of $600,000 claimed by Monolith to be the amount needed to complete the plant and place it in readiness for operation is not a proper termination charge to be asserted under the agreement and the Contract Settlement Act, and is not a cost incident to termination or settlement of the terminated agreement."

Claim No. 3(4–B–3) (Finding D–14) " * * * that the amount of $1,500,000 claimed by Monolith to be the amount needed to operate the plant for a reasonable test period is not a proper termination charge to be asserted under the Agreement, or under the Contract Settlement Act in that it is not a cost incident to termination and settlement of the terminated agreement."

Claim No. 5(4–B–5) (Finding D–16) " * * * that the amount of $7,500,000 claimed by Monolith as 'being the amount needed to place the parties in the position they would have been had the contract been performed, and if the $1,500,000 had been adequate for the test period operation of the plant' is not a proper termination claim or charge to be asserted under the agreement or the Contract Settlement Act, and is not a cost incident to termination or settlement of the terminated Agreement."

In addition, R.F.C. made a finding (Finding F) that Monolith was indebted to R.F.C. in the sum of $460,229.26 plus interest at 2% per annum ($25.22 per day) from April 10, 1950 until paid. The gross item above included interest totaling $112,797.41 on various items making up the gross R.F.C. claim. We discuss the R.F.C. findings and claim in detail later.

(7) Monolith's court action
after Findings.

Nine days after R.F.C. issued its findings and determinations on the Monolith claim and on June 16, 1950, Monolith commenced the present action in the State court; thereafter the action was removed to this court. The complaint was entitled, "Complaint for Damages and Equitable and Declaratory Relief."

The first cause of action recited the Contract's alleged performance by Monolith and the receipt of the stopwork order on July 25, 1946, and the written notice of termination on September 14, 1946; that plaintiff was ready, able and willing to perform the Contract, and that the stopwork order and notice of termi-

nation prevented such performance. The cause recited the prior action and the proceedings therein; alleged that on January 18, 1950 (dated Jan. 16, 1950) plaintiff filed its offer to compromise and settle, and presented its claim, requests and demands pursuant to Section 13 of the Contract Settlement Act, and the issuance of findings and determinations of its claims under the Contract Settlement Act by the R.F.C. on June 7, 1950; that plaintiff was aggrieved by the findings and had exhausted all administrative remedies. It further set forth various monetary claims in the nature of expenditures and claims by Monolith under the "A & C" & "M & O" Agreements as follows:

(a) disbursements and expenditures, $185,533.84 under "A & C" clauses prior to 7/25/46;

(b) disbursements and expenditures under the "M & O" claims to 5/31/50—$29,600.67;

(c) supervision fee under the "M & O" clauses, $32,000;

(d) disbursements and expenditures after the stopwork order of 7/25/46 to 5/31/50 purportedly pursuant to "closing" instructions of 7/25/46—$130,876.-55;

(e) damages for period of 7/25/46 to 5/31/50 in protection, maintenance and management of the plant and "asserting and preserving plaintiff's legal rights under said agreements"—$173,131.06;

(f) additional expenditures to be made after 5/31/50.

(These five items totaled $551,142.12) and in paragraph X (thereafter stricken by the court) alleges damages to the plaintiff in the sum of $7,500,000.

The second cause of action (thereafter stricken by the court) was a cause of action for injunction based upon the same general facts. The third cause of action was for declaratory relief.

**(8) Monolith prayer for relief in the District Court.**

The prayer for monetary damages prayed the sum of $247,134.51 as compensation for services rendered, and for reimbursables under the "A & C" and "M & O" Agreements, to and including May 31, 1950; the sum of $130,876.55 for reimbursables for expenditures incurred in connection with the termination of outstanding purchase orders and Contracts, completing the property, records, closing accounts, inventorying and miscellaneous matters to and including May 31, 1950; and the sum of $173,131.-06 for disbursements and expenditures made for the protection, maintenance and management of the plant and its equipment and in "asserting and preserving plaintiff's legal rights under the Agreements" to and including May 31, 1950. These items in the prayer totaled $551,142.12, being the same items set forth in Count I of the complaint.

The complaint also prayed for an injunction and that plaintiff have judgment against the defendants for (1) $600,000 for the cost of the completion of the plant and readying the plant for operation; (2) the additional sum of $1,500,000 for the cost of operating the plant during the experimental test period; and (3) in the alternative, if (1) and (2) were not granted, for damages in the sum of $7,500,000 for replacing the plant.

**(9) The Motion to Dismiss, etc.**

The matter came before the District court on a motion to dismiss, or for summary judgment. The court prepared a written decision reported in Monolith Portland Midwest Company v. Reconstruction Finance Corporation, D.C., 95 F.Supp. 570. The court found that the monetary claims and alleged expenditures were, at page 579, "similar to and within the scope and extent of the claim as filed with the R.F.C. To that extent alone does the complaint state a cause of action under the Settlement Act." [7] The

7. The claim for "reimbursibles" made to R.F.C. was $635,381.26; the prayer in the complaint $551,142.12 plus interest and for further expenditure made after 5/31/50.

court denied the motions to dismiss and for summary judgment. The court struck various paragraphs of the first cause of action, all of the second cause of action relating to injunction and permitted the third cause of action for declaratory relief to remain. This court, in that decision, held, at page 578:

"* * * the contractor (1) is limited to the scope and extent of his filed claim (with the R.F.C.) in any action that he may bring in the District court following findings and determination by the contracting agency, and (2) that the filed claim in turn is limited as to its allowable scope and extent by the provisions of the Settlement Act and its specific reference to *fair compensation.*"

## B.

### THE QUESTIONS PRESENTED.

We may now be in a position to roughly seize this ancient litigation, which started in 1946, and shake it down so that we may determine the issues we are to decide. Monolith has exhausted its administrative procedure under the Contract Settlement Act. It duly filed its claim with the R.F.C. and findings and determinations were made by the R.F.C. We consider and hold that the present action is a suit on that claim, and we adhere to and reiterate the statement heretofore quoted from our decision on the motion to dismiss. This action, therefore, is in substance an action on Monolith's claim filed with the R.F.C., specifically the proceeding provided for in § 13(b) (2) of the Contract Settlement Act, 41 U.S.C.A. § 113(b) (2).

§ 13(c) (3) of the Settlement Act, 41 U.S.C.A. § 113(c) (3) provides, "Notwithstanding any contrary provision in any war contract, the Appeal Board or court shall not be bound by the findings of the contracting agency, but shall treat such findings as prima facie correct, and the burden shall be on the war contractor to establish that the amount due on his claim or part thereof exceeds the amount allowed by the findings of the contracting agency."

■■ The claim as filed with R.F.C. as heretofore stated, is a claim for in excess of $635,000 for "reimbursables." The complaint here seeks payment for these "reimbursables." Both the claim filed with R.F.C. and the complaint herein contain the claim for $600,000 to complete the plant; for $1,500,000 to test run for one year; and the alternate claim of $7,500,000 to replace the plant. As to these last three items, we can at this time clear the deck and dispose of them. They are not proper claims under the Contract Settlement Act; they are not items of fair compensation. The R.F.C. was correct in determining that they were not proper claims. They sound in specific performance or breach of contract, and neither field of law provides the rule to be applied in cases under the Settlement Act and Reconversion Act on the termination of war contracts.

Nor was this case tried in this court on the theory that these latter three claims were good. In fact, commencing with the pre-trial, Monolith in substance abandoned these claims, and no evidence was offered at the trial on any of the three of them. But there is still in the case more than the problem of the amount due on the claim for "reimbursibles" and the amount due on the counterclaim of the R.F.C.

At the pre-trial, Monolith came up with a new theory. It said in substance, fair compensation included the *value of its contract* with the government. It argued (1) that it had a contract to have tested the commercial feasibility of its processes for extracting alumina from anorthosite; (2) that it had valid patents on the processes; (3) that had tests been made of the commercial feasibility of the process as contemplated by the contract it could have used its valid patents and processes and its know-how in the field of alumina and cement manufacturing and have preempted a large portion of the field of production of alumina and cement; (4) that its claim is for the fair compensation to which it was entitled, including not only its "reimbursables" but an amount in excess of

the $7,000,000 or $8,000,000 shown in its claim and in its complaint in this court. Monolith in fact offered proof that the fair value of its contract was in excess of $85,000,000. Monolith was permitted by the court to amend its complaint to conform to proof.[8]

Thus, assuming that Monolith may pursue in this court an action gauged by the extent and scope of its claim filed with R.F.C., and granting that the issues concerning $600,000 to complete the plant, $1,500,000 for a test run and $7,500,000 for replacement of the plant are out of the case, there still remain the following issues: (I) Were the contracts properly terminated? (II) Does *fair compensation* include the value of the Monolith contract at the time of its termination; (III) If so, what was its value, including issues involving the scope and validity of the Monolith patents, and including the question as to whether R. F.C. is estopped to question the validity or scope of the patents? (IV) What is Monolith entitled to under the heading of "reimbursables"? (V) The counterclaim of the R.F.C. (VI) The problem of interest on both the claim of Monolith and the claim of R.F.C.

## I.

### THE CONTRACTS WERE PROPERLY TERMINATED.

The court of appeals for this circuit held the contracts were prime contracts for war production, Monolith, etc., Co. v. R. F. C., supra, 178 F.2d at page 858. In any event said the circuit, the Settlement Act, § 20(b), 41 U.S.C.A. § 120 (b), provides, " 'Any determination so made (by the contracting agency) that any contract * * * is a war contract, shall be final and conclusive for any of the purposes of this act.' " At page 858. The circuit concluded an alternate ground for its holding by stating

Monolith must exhaust its administrative remedy before it "may have judicial review of the agency's determination." At page 858.

We have reviewed the action of the agency (R.F.C.) in terminating the contract and find its action proper.

§ 202 of the Reconversion Act, 50 U. S.C.A.Appendix, § 1657, reads:

"Sec. 202. (§ 1657) Termination of Prime War Contracts. Any contracting agency shall terminate prime contracts for war production whenever in the opinion of the agency the performance under such contracts will not be needed for the prosecution of the war, and shall not continue performance under such contracts merely for the purpose of providing business and employment, or for any purposes other than the prosecution of the war, unless the Office of War Mobilization and Reconversion finds that the continuation of some or all of the work in process under any such contract will benefit the Government or is necessary to avoid substantial physical injury to a plant or property." 58 Stat. 785.

The "fighting" war contemplated in the statute ended in 1945. R.F.C. did not immediately terminate. On January 10, 1946, Monolith was advised that the office of war mobilization had found that the continuation of the project would benefit the government.[9]

Thereafter, on 6/26/46 the matter was further considered at a meeting participated in by officials of the War Assets Administration, Civilian Production Administration, Department of the Interior, the Office of War Mobilization and Reconversion and of R.F.C. The recommendation of these officials for termination of the contracts was approved by the

---

8. The court sees now that this ruling was clearly in error. The permitted amendment increases the prayer of the complaint beyond the extent of the claim filed by Monolith against R.F.C. We discuss the problem hereafter.

9. Four alumina plants were built during the war: (1) Harleyville in South Carolina, (2) Monolith in Wyoming, (3) Salem, Oregon and (4) Kalunite in Utah. On 1/10/46 continuation of work on the first three was directed.

executive committee of R.F.C. and forwarded to John R. Steelman, Director of the Office of War Mobilization and Reconversion. He approved the proposal and so advised R.F.C. on July 22, 1946. The stopwork order of 7/24/46 and termination notice of 9/10/46 set forth above, followed.

Thus, the exception in Section 202 of the Reconversion Act was satisfied. The termination notice of 9/10/46 advised Monolith that the War Department had advised R.F.C. the facilities were no longer needed for production for the government and that the Director of War Mobilization had directed R.F.C. to terminate the contracts.

Monolith argues that some resolution was required by the R.F.C. board. The record shows that all interested government agencies were consulted and that R.F.C. acted thereafter and after express direction from the Office of War Mobilization. No resolution by R.F.C. was required. However, the record shows approval of R.F.C.'s recommendation to Steelman by its executive committee.[9a]

Nor can Monolith properly raise this point. It petitioned for findings under the Settlement Act and then filed the present action and in substance alleged its compliance with § 13 of the Settlement Act.

§ 202 of the Reconversion Act *required* R.F.C. to *terminate* when the contracts were no longer needed for the prosecution of the war. The contracts would undeniably have been terminated earlier but for the intervention of the Office of War Mobilization under the exception contained in § 202.

■ Having prevented termination, the Office of War Mobilization in July 1946, properly directed stopwork and termination. We hold the contracts were properly terminated by the R.F.C., in substance performing a ministerial duty and complying with the directions of the Office of War Mobilization and Reconversion.

## II.

## DOES FAIR COMPENSATION AS USED IN THE SETTLEMENT ACT, INCLUDE THE VALUE OF MONOLITH'S CONTRACT AT THE TIME OF ITS TERMINATION?

At the time of trial, there appeared to the court to be a possibility that the case might be disposed of without an extensive trial, by trying the question of Reimbursables and the counterclaim of the R.F.C. and by holding that Monolith, under the concept of fair compensation contained in the Contract Settlement Act, would be entitled only to what is referred to hereafter as its "reimbursables." Such a holding would have materially shortened the trial. However, Monolith earnestly urged a full trial on the merits; it urged further that the concept of fair compensation included the "value of the contract" which was terminated. In addition, during the pretrial conference, after both sides had briefed their concept of fair compensation, the court suggested that possibly a third alternative was involved, that is what, if anything, Monolith was entitled to under all the facts of the case.

The court then raised with counsel, the question as to whether or not, if the case were fully tried on the merits, the record made might be available in any further proceeding that might ensue.

The case had been in litigation since Nov. 7, 1946, and gave all evidence of again running the full gamut of our courts. Counsel filed a stipulation providing in substance, that the record made at this trial would be the record on any

9a. Exhibit BE, letter of July 2, 1946 from Charles B. Henderson, Chairman, R.F.C. to John R. Steelman, Director, Office of War Mobilization and Conversion, refers to a meeting of officials of various governmental agencies, including R.F.C.; lays out the proposal to terminate; and submits it to Steelman for his consideration. Endorsed on the last page, below Henderson's signature, appears the approval of the executive committee of R.F.C.

By Exhibit BF, Steelman concurred in the recommendation.

new and further trial that might be. required, subject to the presenting of additional evidence at the option of either party or if so directed by an appellate court.

Accordingly, the court tried the case on the merits and heard all the evidence either side desired to adduce. The court, in determining to so try the case, stated to counsel that if the case eventually turned off on the contention urged by R. F.C., namely that Monolith was entitled only to its so-called "reimbursables" that the court would make, for the benefit of the appellate court, alternate findings of fact and conclusions of law on Monolith's theory of the case, viz., the value of the contract, so that if the trial court was in error in the one holding, the Appellate Court would have the benefit of the views of the trial court on Monolith's theory of the case. This we propose to do in this case.

## THE SECOND SUPPLEMENT AND AMENDMENT TO THE COMPLAINT.

Before we pass to the major problem, we consider and dispose of certain issues injected into the case during the trial.

On January 1, 1953, pursuant to motion by Monolith, the court permitted Monolith to file a "Second Supplement and Amendment to the Complaint", subject to R.F.C.'s motion to strike. In that document, Monolith repeated the allegations of its original complaint and further alleged that "the evidence and circumstances established in the record at this time prove that the value of plaintiff's rights at the time of the termination of the contract by defendant, was the sum of $85,000,000 and that plaintiff alleges that $85,000,000 is the reasonable worth and fair compensation which plaintiff would have received if defendant had performed its contract and not terminated plaintiff's contract * * * and is the fair and reasonable compensation to be awarded plaintiff herein for its loss of a test of its process and its loss of the right to a conveyance of the plant on a competitive price."

Monolith further alleged that it had remained in possession of the plant, exercising care and supervision until May 22, 1950, when the R.F.C. demanded possession and plaintiff unwillingly surrendered it; that on August 31, 1951, R.F.C. obtained an appropriation from Congress in the sum of $350,000 to complete the plant for operation of a process to produce alumina from clay; that on July 3, 1952, R.F.C. obtained an appropriation from the Congress of $1,000,000 to operate the plant; that R.F.C. by taking and retaining possession of the plant became obligated to pay Monolith the fair value of work, labor, materials, money and services which Monolith had expended and is expending by the performance of such acts; that as of October 31, 1952 Monolith had expended for these reasons the sum of $825,875.-27; that Monolith has expended monies since October 21, 1952, in prosecuting this action and will be required to spend further amounts until final payment of its claims, and prays judgment for $85,-825,875.27 plus interest and costs of suit.

It is not too clear on what theory Monolith is proceeding by the amendment. It may be attempting to assert (1) claims *independent* of the Settlement Act, or (2) claims *under* the Act. And in either alternative it may be asserting,

(a) claim for just compensation under the Fifth Amendment for a taking;

(b) claim on quantum meruit for alleged benefits conferred on R.F.C.

### (1) Claims independent of the Settlement Act.

If Monolith is attempting to assert independent of the Contract Settlement Act, a claim for relief for a taking under the eminent domain provisions of the Fifth Amendment, then this claim is clearly not good. The action is one upon a claim filed with the contracting agency on which the contracting agency made findings and determinations. Monolith's rights lie under the Settlement Act and not independent of the Act. This

was the holding of the Monolith case in the circuit. 178 F.2d 854, 858.

This court reiterates its holding made on the motion to dismiss:

"* * * it follows that the contractor (1) is limited to the scope and extent of his filed claim (with R.F.C.) in any action that he may bring in the District court following findings and determination by the contracting agency, and (2) that the filed claim in turn is limited as to its allowable scope and extent by the provisions of the Settlement Act and by its specific reference to fair compensation." 95 F.Supp. 570, at page 578.

This court simultaneously denied the defendant's motion to strike the plaintiff's third cause of action stating,

"* * * it sets forth a cause of action for declaratory relief and this court, by this opinion, has declared the rights of the parties in the controversy between them." 95 F.Supp. 570, at page 579.

Moreover, in order to bring into play the just compensation provision of condemnation law, Monolith must first establish there has been a taking of its property by the R.F.C. The allegations of the Second Supplement and Amendment to Complaint show that the plant was later operated by the Bureau of Mines, an agency in the Department of the Interior, and not by the R.F.C. Although there is alleged that the R.F.C. procured the appropriations, there was no evidence whatsoever of this, but to the contrary, evidence showed that the Bureau of Mines sought the appropriations, and they were made by Congress. Thus, if there was any taking, it was by the United States and not by the R.F.C.

Nor can Monolith proceed upon a claim for quantum meruit independent of the Contract Settlement Act, for many reasons, only one of which need be mentioned. R.F.C. reported the plant as surplus on September 14, 1950, and transferred legal title to the United States on February 26, 1952. The dec-laration that the property is in excess of the needs of the corporation, transfers all beneficial ownership to the United States and thereafter the defendant is merely a formal title holder. U. S. v. Shofner Iron & Steel Works, 9 Cir., 1948, 168 F.2d 286. Thus, the beneficial ownership of the plant was in the United States after September 14, 1950, and the appropriations by Congress in 1951 and 1952 benefited the United States and not the defendant, R.F.C.

(2) Claims under the Settlement Act for Just Compensation or Quantum Meruit.

We discuss hereafter the scope and meaning of "fair compensation" provided for in the Settlement Act, including whether there was a taking for which just compensation is due and including the quantum meruit theory of benefits conferred on R.F.C.

Here we discuss these theories limited to the new allegations contained in the Second Supplement and Amendment to the Complaint, specifically the activities of the Bureau of Mines after the termination and after the appropriations by Congress for Bureau of Mines operation.

What we have said heretofore, applies here. If Monolith desires to press a claim for $85,000,000, it must first exhaust administrative proceeding by filing a claim with R.F.C. for such amount and securing findings and determination, Monolith case, 178 F.2d 854. This Monolith has not done as to the $85,000,000 claim.

Even treated as a claim under the Act, the subsequent operation of the plant by the Bureau of Mines was not a taking by R.F.C. nor was any one but the United States benefited by the operation by the Bureau of Mines after the plant was declared surplus on September 14, 1950.

The Second Supplement Amendment to the complaint was filed over the objections of R.F.C. The court indicated it saw little real merit to the cause of action and permitted it to be filed subject to the defendant's motion to strike The R.F.C. in its brief, moves to strike

the pleading. The court was in error in permitting it to be filed, and the motion to strike is granted.

## FAIR COMPENSATION.

■ We are faced at the outset by the meaning of the words, "fair compensation" as used in the Contract Settlement Act of 1944, and with the intent of Congress in the selection of that term. We assume that members of Congress were familiar with the Fifth Amendment and the term "just compensation" used therein. We assume also that Congress was familiar with the many cases in the field of condemnation, and the interpretation placed upon the term "just compensation" by the courts.

Congress deliberately chose to use a different term, "fair compensation" and also to specify guide posts in the application of the term, Settlement Act § 6 (b) and (d), 41 U.S.C.A. § 106(b) and (d).

Although the words "just" and "fair" in a dictionary mean substantially the same, there can be no doubt that Congress, in deliberately choosing the word "fair" and in setting up the guide posts referred to above, was using a different measure of recovery than under the condemnation cases.

This court, in its prior decisions, 95 F. Supp. 570 and 102 F.Supp. 951, stated that "The termination of war contracts under the Reconversion and Settlement Acts is closely analogous to an action for condemnation," 95 F.Supp. 579 and 102 F.Supp. 954, but we go no further than to state that some analogy exists. There are obvious differences.

Monolith relies on old U. S. cases that demonstrate these differences. Monongahela Navigation Co. v. U. S., 1893, 148 U.S. 312, 13 S.Ct. 622, 37 L.Ed. 463, was a condemnation case. The war powers of Congress were not involved. There was a taking and just compensation was decreed. But in our case, there was no taking of Monolith's patents and the Monolith case as to the "value of its contract" is predicated on its patent rights. Monolith still has its patents.

Brooks-Scanlon Corp. v. U. S., 1924, 265 U.S. 106, 44 S.Ct. 471, 68 L.Ed. 934, relied on by Monolith can be likewise distinguished. There the President was authorized to requisition ships and materials and supplies, Emergency Shipping Act of 6/15/1917, 40 Stat. 182, c. 29. He delegated the power to the Emergency Fleet Corporation and it requisitioned ships and materials in the builder's shipyard and directed the builder to complete a contract for a ship. The statute (supra) provided for "just compensation." It was held that "[the Fleet Corporation] put itself in the shoes of claimant and took from claimant and appropriated to the use of the United States all the rights and advantages that an assignee of the contract would have had. * * * *The contract was not terminated.* The * * * result * * * was to take from claimant its contract and its rights thereunder." 265 U.S. at page 120, 44 S.Ct. at page 473, and just compensation was ordered. [Emphasis added.]

Here was a wartime Act, where Congress expressly used the well adjudicated term, "just compensation." The case was the equivalent of a condemnation proceeding. The result logically followed.

Also relied on are two cases under the Lever Act, Act of Aug. 10, 1917, c. 53, 40 Stat. 276. Seaboard Air Line Railway Co. v. U. S., 1923, 261 U.S. 299, 43 S.Ct. 354, 67 L.Ed. 664 and U. S. v. New River Collieries Co., 1923, 262 U.S. 341, 43 S.Ct. 565, 67 L.Ed. 1014. The Lever Act also provided for requisition by the President and that "just compensation" should be paid, and the court so held. Congress expressly used the term just compensation and the cases are authority for the rule in condemnation cases.

■ The Circuit Court has held in the Monolith case, supra, 178 F.2d 858, that the contract in question was a prime contract for war production. Inherent in that decision is the ruling that the Congress acted under the War Powers in passing the Contract Settlement Act. We held in our first Monolith decision,

95 F.Supp. 576, that the government's war powers sustain the right of Congress to terminate and thereby impair contracts. "The Constitution does not deny to the Congress the right so to affect contracts if to accomplish purposes within its legislative power." Spaulding v. Douglas Aircraft Co., 9 Cir., 1946, 154 F.2d 419, 426. We are convinced that the Settlement Act and the Reconversion Act were enacted under the war powers of the Congress. This would demonstrate clearly why the Congress chose not to use the words "just compensation" or the measure of damage long judicially established under the wording of the Fifth Amendment.

We interpret Lichter v. U. S., 1948, 334 U.S. 742, 68 S.Ct. 1294, 92 L.Ed. 1694, also cited as Pownall v. U. S., as sustaining the Renegotiation Act under the war powers of the Congress and we believe that the Reconversion and Settlement Acts are closer in their genesis and effect to the Renegotiation Act than they are to condemnation proceedings.

The decision of the three circuits referred to in the Lichter case, supra, held the Renegotiation Act constitutional. The Sixth Circuit in Lichter v. U. S., 1947, 160 F.2d 329, 332, rejected a contention based on the Fifth Amendment. The Ninth Circuit in Pownall v. U. S., 1947, 159 F.2d 73, relied on its prior decision in Spaulding v. Douglas Aircraft Co., supra, which in turn relied on the war powers of the Congress to sustain the Act. The First Circuit in Alexander Wool Combing Co. v. U. S., 1947, 160 F.2d 103, affirmed per curiam on the basis of the district court decision in 66 F.Supp. 389. This decision in turn, relied on the war powers of Congress to sustain the Act and rejected a contention based on the Fifth Amendment.

Much of what was said by the Supreme Court in Lichter v. U. S., 1948, 334 U.S. 742, 68 S.Ct. 1294, 92 L.Ed. 1694, would apply to the *Contract Settlement Act* and the *War Mobilization and Reconversion Act*.

"The Renegotiation Act was developed as a major wartime policy of Congress comparable to that of the Selective Training and Service Act * * *. The authority of Congress to authorize each of them sprang from its war powers. Each was a part of a national policy adopted in time of crisis in the conduct of total global warfare by a nation dedicated to the preservation, practice and development of the maximum measure of individual freedom consistent with the unity of effort essential to success." 334 U.S. at pages 754–755, 68 S.Ct. at page 1301. * * * "The conscription of manpower is a more vital interference with the life, liberty and property of the individual than is the conscription of his property or his profits or any substitute for such conscription of them. For his hazardous, full-time service in the armed forces a soldier is paid whatever the Government deems to be a fair but modest compensation. Comparatively speaking, the manufacturer of war goods undergoes no such hazard to his personal safety as does a front-line soldier * * *. The constitutionality of the conscription of manpower for military service is beyond question. The constitutional power of Congress to support the armed forces with equipment and supplies is no less clear and sweeping. It is valid, a fortiori." 334 U.S. at page 756, 68 S.Ct. at page 1302.

"In view of this power 'To raise and support Armies * * *' and the power granted in the same Article of the Constitution 'To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers * * *' the only question remaining is whether the Renegotiation Act was a law 'necessary and proper for carrying into Execution' the war powers of Congress and especially its power to support armies. * * * *" 334 U.S. at pages 757–758, 68 S.Ct. at page 1303.

None of the cases relied on by Monolith were cited or considered by the Supreme Court in deciding the Lichter case. The court faced the alternative posed by global war and demonstrated the real basis for its decision in holding the act valid. 334 U.S. at pages 765, 766, 68 S.Ct. at page 1307:

"Congress furthermore has a primary obligation to bring about whatever production of war equipment and supplies shall be necessary to win a war. Given this mission, Congress then had to choose between possible alternatives for its performance * * * the first alternative * * * Congress did not choose, namely, that of mobilizing the productive capacity of the nation into a governmental unit on the totalitarian model. This would have meant the conscription of property and of workmen. * * * Faced with this ironical alternative of converting the nation in effect into a totalitarian state in order to preserve itself from totalitarian domination, that alternative was steadfastly rejected. The plan for Renegotiation of Profits which was chosen in its place by Congress appears in its true light as the very symbol of a free people united in reaching unequalled productive capacity and yet retaining the maximum of individual freedom consistent with a general mobilization of effort. * * *"

And at page 787 of 334 U.S., at page 1318 of 68 S.Ct.: "One of the primary purposes of the renegotiation plan for redetermining the allowable profit on contracts for the production of war goods by private persons was the avoidance of requisitioning or condemnation proceedings leading to governmental ownership and operation of the plants producing war materials." * * *

■ The provisions of the Settlement Act and the Reconversion Act for the termination of war contracts and for the payment of fair compensation to war contractors, as provided in the Settlement Act, was a war measure enacted under the War Powers of Congress, and reasonably necessary and proper for carrying into execution the War Powers of the Congress, and to prevent a complete disruption of the economy of the country following the end of the war.

Monolith's contract was one of thousands subject to termination under the Act. The government's commitment on the Monolith project was less than 5 million. Monolith now claims 85 million because of the termination. The adoption of Monolith's theory of a constitutionally fixed, legislation proof and Congressionally untouchable governmental liability for the value of these terminated contracts would have lead to national bankruptcy.

That the Settlement Act does not deprive the War contractor of his property without just compensation is clearly evident from the Settlement Act. § 6(b), 41 U.S.C.A. § 106(b), provides in part: "Each contracting agency shall establish methods and standards * * * for determining fair compensation for the termination of war contracts on the basis of actual, standard, average, or estimated costs, or of a percentage of the contract price based on the estimated percentage of completion of work under the terminated contract, or on any other equitable basis, as it deems appropriate. * * * *"

§ 6(d), 41 U.S.C.A. § 106(d), provides: "as hereinafter provided, the methods and standards established under subsection (b) of this section for determining fair compensation for termination claims which are not settled by agreement shall be designed to compensate the war contractor fairly for the termination of the war contract, taking into account—

"(1) the direct and indirect manufacturing, selling and distribution, administrative and other costs and expenses incurred by the war contractor which are reasonably necessary for the performance of the war contract and properly allocable to the

terminated portion thereof under recognized commercial accounting practices; and

"(2) reasonable costs and expenses of settling termination claims of subcontractors related to the terminated portion of the war contract; and

"(3) reasonable accounting, legal, clerical, and other costs and expenses incident to termination and settlement of the terminated war contract; and

"(4) reasonable costs and expenses of removing, preserving, storing and disposing of termination inventories; and

"(5) such allowance for profit on the preparations made and work done for the terminated portion of the war contract as is reasonable under the circumstances; and

"(6) interest on the termination claim in accordance with subsection (f) of this section; and

"(7) the contract price and all amounts otherwise paid or payable under the contract."

The section also specified various items which should not be included as elements of cost and finally concluded, "The aggregate amount of compensation allowed in accordance with this subsection (excluding amounts allowed under paragraphs (3) and (4) above) shall not exceed the total contract price reduced by the amount of payments otherwise made or to be made under the contract." * * *

There is a close similarity between the Renegotiation Act and the Settlement Act. The former took excess profits already received, the latter prevented future profits, anticipated prior to termination, from being received. Both to a certain extent impaired the contract involved. Both were enacted under the War Powers of Congress during the progress of the war. Both concerned war contracts. The operation of the Renegotiation Act was retroactive and prospective. The operation of the Settlement Act was retroactive and pros-

pective. The economic purpose of both Acts was the same.

■■■ The provision for fair compensation was deemed by Congress to be reasonable and proper for the complete compensation of war contractors. Like the Renegotiation Act, the Acts in question were not "the requisitioning or condemnation of private property for public use." Lichter v. U. S., supra, 334 U.S. at page 787, 67 S.Ct. at page 1317, and were "not a deprivation of a subcontractor of his property without due process of law in violation of the Fifth Amendment." Lichter v. U. S., supra, 334 U.S. at page 788, 68 S.Ct. at page 1318.

## QUANTUM MERUIT UNDER THE SETTLEMENT ACT.

Both Monolith and R.F.C. agree that compensation allowable under fair compensation shall be equitable. The reading of the Settlement Act leads clearly to this conclusion. Though not applicable here, § 1(b), 41 U.S.C.A. § 101(b), speaks of "equitable final settlements" as an objective and § 7(e), 41 U.S.C.A. § 107(e) provides for equitable payments. The very meaning of "fair compensation" is equitable compensation.

If Monolith is pressing a claim based on quantum meruit it must be based on its claim filed with R.F.C. To the extent that no claim was filed with R.F.C., Monolith has not exhausted its administrative remedy.

■■■ The compensation must be equitable to the contractor, Monolith and to the public. "Whatever the circumstances under which such constitutional questions arise, the dominant consideration always remains the same: What compensation is 'just' both to an owner whose property is taken and to the public that must pay the bill?" U. S. v. Commodities Trading Corp., 1950, 339 U.S. 121, at page 123, 70 S.Ct. 547, at page 549, 94 L.Ed. 707, at page 712.

There is express provision in the Settlement Act, § 17, 41 U.S.C.A. § 117, for recovery on quasi contracts. But this is not relied on by Monolith. Its claim of quantum meruit is made within the

846

framework of the fair compensation provision.

 The fair compensation allowed under the Settlement Act does not include benefits lost as a result of termination. To hold otherwise would be contrary to the avowed purpose of the Settlement Act, § 1(c), 41 U.S.C.A. § 101(c), "to assure uniformity among Government agencies in basic policies and administration with respect to such termination settlements". Permitting recovery of benefits lost would be the equivalent of recovery of general damages for termination which the Settlement Act was enacted to prevent. A reading of the Settlement Act, § 6(d), 41 U.S.C.A. § 106(d), shows clearly that the contractor was not to receive compensation for benefits lost. No provision for profit or damages was made except § 6(d) (5), "profit on the preparations made and work done for the *terminated portion* of the war contract as is reasonable under the circumstances". [Emphasis added.]

We conclude that the "fair compensation" provisions of the Settlement Act were constitutionally valid as a measure for recovery on a terminated contract; that the termination of war contracts was not a taking but even if it were, that the fair compensation provided was just compensation under the constitution; that equitable principles apply in the application of fair compensation; that fair compensation allowed herein is limited by the claim filed by Monolith with R.F.C.; that the alleged *"value of the contract"* to Monolith would be a claim within the nature of a claim for general damages for benefits lost, and therefore the equivalent of Monolith's prospective profits from the contract venture and as such is not permitted under the fair compensation clause of the Contract Settlement Act.

We consider hereafter under the subject, "reimbursables," the fair compensation to which Monolith is entitled.

III.
ASSUMING THE VALUE OF THE TERMINATED CONTRACT WAS PART OF FAIR COMPENSATION.

(Alternate Finding.)

As indicated heretofore, we now consider an alternate decision as requested by counsel, in the event we are in error in our holding under II (supra).

 Monolith contends a Contract is property. We agree. Lynch v. U. S., 1934, 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434; Monongahela Navigation Co. v. U. S., 1893, 148 U.S. 312, 13 S.Ct. 622, 37 L.Ed. 463; Russian Volunteer Fleet v. U. S., 1931, 282 U.S. 481, 51 S.Ct. 229, 75 L.Ed. 473.

Monolith contends that it was entitled to a test of the commercial feasibility of its process, which would have been of great value. This right it claims it lost by termination. What then was the nature and scope of this so-called right to test?

First a comment on Monolith's contentions. All Monolith's proof tended to show that the process was commercially feasible. Monolith called various witnesses who testified that commercial grade alumina could be made by the Monolith process, and even fixed the cost per ton of such production and estimated the profits. On the assumption that the patents were valid, a Dr. Babcock testified that the value of Monolith's contract rights would be $8,000,000. Mr. Coy Burnett, the President of Monolith testified the rights under the contract has a value of $85,000,000 without exclusive patent rights.[10] In the face of this positive testimony, Monolith contended that by termination it lost its right to test the commercial feasibility of its process. If Monolith's testimony is to be credited, commercial feasibility was an established fact. Therefore, Monolith lost little if anything, by its failure to

10. On the basis of Burnett's testimony, Monolith filed its "Second Supplement and Amendment to the Complaint" referred to above.

secure the test-run. If on the other hand we find that the test run was necessary to establish the commercial feasibility of the process, then the Monolith testimony as to the value of its contract right is of little weight.

### A. The Contract Provisions as to Termination and Test Run.

#### 1. Readiness for Operation.

Proceeding to Monolith's so-called right to test, we turn first to the contract. It was subject to termination by either party on 30 days notice, 60 days after the "completion of the plant and its readiness for operation." This would seem to give Monolith a 90 day run of the plant to test its process, except for a dispute between the parties on the meaning of "readiness for operation."

Monolith's contention on this point, as it has been on most issues in this case, is extreme. Monolith contends that the clause means that the plant shall be physically completed, and that there should then follow testing of all the parts, unit by unit, and then quantities of material should be worked through the various units of the plant separately, and then the plant test operated as an integrated unit at full capacity, and that when the time arrives that the plant may be thus operated as an integrated unit at full capacity, it will be "in readiness for operations." Monolith asserts that it would take approximately nine months after completion of the plant for it to be in this state of "readiness for operation" and that the contract would then permit thereafter ninety days operation before there could be a termination under the terms of the contract.[11] Its complaint alleged that it would take a full year to test the process.

R.F.C. on the other hand contends that the plant would be in "readiness for operation" when the various parts of the equipment, such as the electrical system, the water lines and valves, and the mechanical parts of the plant had been test-ed and found in working order, and when there was on hand the raw materials and the plant was ready to start test operations, even though some other parts of the plant, might not be complete.

The plant at Monolith was a full size, industrial unit of 60 tons of alumina per day. If the government exercised its option to secure greater output this would have been done by constructing similar units of like size, rather than by increasing the size of any one unit. The Monolith process and Monolith's theory as to its value was essentially that of producing alumina from anorthosite and at the same time using the residue to make cement. The alumina plant at Laramie had been constructed adjacent to the Monolith cement plant to be connected with an overhead conveyor feed belt and connected by an underground pipe system for slurry. Thus, a test of the commercial feasibility of the Monolith process would entail not only the commercial production of alumina, but the integrating of the operation of the alumina plant with the operation of the cement plant.

Monolith's contention would mean that before there was "readiness for operation" all the "bugs" of the alumina production process on a commercial basis would have to be ironed out. Thus, for example, if it was determined that the leaching tanks were 50% too small for commercial production of alumina, then they would have to be replaced. If it was discovered that the slurry system did not adequately move the mixture of water and materials from the alumina plant back to the cement plant, for sintering (burning) then this would have to be corrected before there was "readiness for operation." The net result of Monolith's contention is that before there was "readiness for operation" there would be preliminary test runs to allow integrating the process in the alumina plant, and to allow integrating that process with cement production from the residue. Thus, in substance, the workability of the dual

---

11. This type of termination never occurred. The contract was terminated pursuant to the Reconversion Act before full operation began.

process for production of alumina and cement would be worked out completely, under Monolith's contention, before the plant was in "readiness for operation."

 This extreme view cannot be accepted by the court. The court believes that the plant would be in "readiness for operation," in line with R.F.C.'s contention, when the electricity, water and mechancial parts were tested and found in working order; when there was a supply of raw material on hand, and when all other things in connection with the alumina plant and the cement plant were ready to start a run of material through the combined plants. This would be true even if the plant was technically not completed, as for example, if a portion of a roof remained to be put on, or windows to be supplied. There could conceivably be many things remaining to be done to *complete the plant* and yet the mechanical parts of the plant might be in "readiness for operation."

### 2. Other Contract Provisions.

Other provisions of the Contract do not assist in the solution of this problem. The M & O portion of the contract provided for a Management and Operation Fee, "Beginning with the readiness *of the plant or any part thereof* for operation." [Emphasis added.]

The Contract also provided that Title II, the "M & O" section, should be in force "from the readiness of the plant *or any part thereof for operation.*" [Emphasis added.]

Monolith, on February 1, 1945, called into play the "M & O" Program upon the completion of the laboratory, and claimed and was allowed the management and operation fee starting with that date. The difficulty with the other sections of the contract referred to above is that they use the words, "the plant or part thereof." Therefore, although the management and operation provisions came into play on February 1, 1945, it does not follow that the plant was in "readiness for operation", on that date.

### 3. Monolith's Inconsistent Positions.

However, the actions of Monolith and various of its agents demonstrate that its theory of "readiness for operation" is an after-thought in this litigation. Correspondence by Mr. McBride, Manager of the Project for Monolith, demonstrated that he had in mind no such theory of "working up" the plant unit by unit, prior to a "readiness for operation." On June 19, 1945, by letter to D.P.C. he wrote that the Peter Kiewit Sons Co., builders of the plant, were making every effort to have the entire plant "completed and in condition to make an actual test run during the week of August 6", and that the "initial testing of the equipment, piping and wiring, * * * cannot commence before July 20 which will schedule the actual starting date under complete operations on or about August 15." This would seem to mean that there was contemplated the testing of equipment on July 20th, a test run on August 6th and complete operation on August 15th, all in 1945. On July 28, 1945, he wrote R.F.C., "it is presently contemplated that the plant facilities will be completed, ready for initial full scale run in early September." Thus, McBride, the Project Manager for Monolith did not share counsel's views.

Although Monolith now argues that a 90 day test run would be sufficient, in May of 1952, Mr. Russell, Monolith's Vice President testified before a Congressional Committee that a 60 to 90 day operational run is too short a period in which to obtain any worthwhile result when referring to proposed Bureau of Mines operation.

### 4. The Parties Never Contracted for a Test Run.

The original "A & C" Contract provided for a total commitment of $3,885,000 and provided that this was the maximum amount which D.P.C. would be required to expend under Title I, the A & C provisions. This was subsequently increased to $4,302,648 and later to $4,-639,048. The Contract provided that

the contractor did not however, guarantee that the Programs could be completed for such amount. This fixing of maximum amounts is inconsistent with Monolith's contention that it had a contract right to test the process. Thus, the parties were uncertain as to whether or not the amounts allocated could even complete the A & C Program, and if the A & C Program was never completed, obviously there could never be a test of the process.

The Contract obligated Monolith to "use its best efforts to operate the plant at capacity, *unless D.P.C. shall approve or direct otherwise.*" [Emphasis added.] Thus, the D.P.C. could have prevented a test of the process. If Monolith had contracted with D.P.C. for a right to test the process such a provision would not have been included.

The court concludes that the contract concerned an experimental process which had never been theretofore commercially operated insofar as the making of alumina was concerned, in a full sized industrial plant, and that the contract permitting termination on 30 days notice after 60 days operation was to protect the D.P.C. from the very situation that would follow if Monolith's interpretation of "readiness for operation" was correct. With such an experimental process, it is entirely conceivable that years might be involved before there could be a full and successful operation of the industrial plant, not to mention its operating integration with an accompanying cement plant. The termination clause was inserted in part for this very purpose.

We conclude that a so-called right to test the commercial feasibility of the Monolith process was not a right

contracted for by Monolith; that the contract was terminable by its terms 90 days after the plant was in readiness for operation, whether actually operated or not; and that with an experimental process, such a period, even if devoted to actual operation, was too limited for full and complete test of commercial feasibility.

**B. Monolith Could Make Alumina but Quaere as to Cost.**

Assuming a test run with a possible 90 day cut off and assuming Monolith know-how in cement manufacture and its experiments with making alumina in the laboratory and its limited work with its pilot plant, what would have resulted from the Monolith process?

The court finds that Monolith made a commercial grade of alumina by its process in the laboratory. The court finds that it made a commercial grade of alumina from products obtained from its pilot plant.[12]

The court also finds that eventually a commercial grade of alumina could be made at the plant and that cement could be made from the residue. At first blush this sounds encouraging to Monolith. But at least three other matters must be considered: (1) the cost of the manufacturing process, (2) the time and work required to finally work out the Monolith process on an industrial basis and (3) the time required to work out the integration of an alumina and a cement plant.

The government's money was well spent in constructing the Laramie alumina plant,[13] and in its subsequent test operation by the Bureau of Mines. We feel content that in the event of another war or major crisis, with a greatly expanding need for aluminum, that our native clays and anorthosite [14] can pro-

---

12. The pilot plant (also referred to as a "test" plant) was built prior to the construction of the government plant. It never was operated as a complete or integrated unit. It was dependent on the cement plant for some operations. Materials put through the pilot plant were put through in batches at different times through different units.

13. The three other test plants were worthwhile. Alumina was made at Harleyville, which operated for a year, using a lime-sinter process with clay as a raw material.

14. Alumina makes up $\frac{1}{8}$ to $\frac{1}{7}$ of the earth's crust.

duce all the alumina we need. But if this production is undertaken it will be done at a time when the cost of alumina is not a factor. It will be the need for a full domestic supply of alumina that will dictate.

A large part of the record in this case deals with costs and prospective profits. To analyze it at length and evaluate the weight given to the various experts' testimony would serve no useful purpose. Briefly the court finds that the cost of producing alumina by the Monolith process far exceeds the cost at which alumina is now being produced commercially. The court finds that the operation of the Monolith process on a large scale basis (66 tons per day) will present many problems, anticipated and unanticipated, and require more than the mere erection of a model plant and a subsequent 90 day test run before the process is on a sound commercial basis.

Finally, the integration of an alumina and a cement plant will present problems that increase in number and difficulty, not by arithmetical but by geometric progression. Both the making of alumina and cement are chemical processes based on formulas and reactions of the various elements contained. The raw material here involved (anorthosite) varies widely in its element content. Thus, by sorting and mixing of raw materials, an attempt is made to secure the proper balance for the initial process of making alumina. We are not dealing with a laboratory with accurate scales, or even with a pilot plant using small batches. We are dealing with a commercial unit where feeding of raw materials is not done by spoon or measure, but by steam shovel or drag scoop. Every variation of the combination of materials in the alumina process will have its repercussions in the cement plant. A breakdown or problem in a single unit affects both plants.[15] The combination process for cement and alumina

is not impossible of attainment. It will require time, trained minds, hard work and experimentation. These are real factors in evaluating Monolith's alleged "value of its contract."

### C. Markets for Products; Other Competing Processes.

We briefly mentioned other factors to be considered in assessing the value of the contract. Monolith would be first in the field if the process proved a success. This must be measured against the possibilities of commercial success and the prospects of a termination of the contract, pursuant to its terms after only a 90 day test run. If Monolith could not exclude others from the use of the lime-soda-sinter process (a point we consider hereafter) competitors might build their own plants and use the same or a similar process.

Three major producers in the aluminum field would be prospective purchasers of the end products of alumina. All have plants of their own. They might not choose to buy the alumina Monolith produced.

Alumina must be processed in large and expensive electrically operated plants to convert the oxide (alumina) to pure aluminum suitable for commercial and industrial use. If Monolith was unable to sell its alumina the problem of constructing a reduction plant would arise, since all three producers have their own reduction plants. No reduction plant operates independently.

Monolith had a first refusal of an offer to buy the plants. There was no requirement the government must sell. If the government did not sell or Monolith did not meet a bona fide offer, it would be forced to build a plant. A lime-soda-sinter plant is three times as costly as a plant using the Bayer process.

Other competitive processes for making alumina were available and there is always the possibility of new processes being developed.

---

15. There was testimony that the residue in a form of slurry could be run into a pit near the cement plant for future use. If this residue possessed even the general characteristics of raw material for cement, there was no satisfactory showing it would not harden and require further processing.

The old standard process is the Bayer process, using bauxite which treats 2 tons of material to get 1 ton of alumina. It avoids the expense of sintering (burning). A lime-soda-sinter process such as Monolith's handles 11 tons of materials to get 1 ton of alumina.

The "Red Mud" process is a combination of the Bayer plus the lime-soda-sinter process in connection with the residue. It is in commercial operation.[15a]

Three general types of process have been studied by the Bureau of Mines,[16] the acid,[17] the alkaline,[18] and a process involving reduction of aluminum silicate to form aluminum silicon followed by recovery of alumina, and silicon as a by-product. This latter process was available. Another process, the Pedersen, having two by-products, iron and dicalcium silicate residue, began operating the Norway in 1929. The dicalcium silicate residue was dumped in the sea.[19]

We conclude that the lime-soda-sinter process (in which category the Monolith process belongs) although the best of the processes involved in the four government test plants built during the war, is commercially untried and could not be perfected with a 90 day test period. It is in competition with other known and tested processes proven to be cheaper. It has great possibilities, especially in time of war, where cost will be a minor factor compared to availability of alumina.

One further observation. The results of the Bureau of Mines operation scheduled for 1954, in which they hope to operate with at least a 60 ton per day alumina volume will be available to all, including Monolith.

D. The Patents: Monolith's Alleged Right to Exclude Others from the Use of its Process.

 Under plaintiff's theory, "the value of its contract" was predicated in large part upon the ability of Monolith to exclude others from the use of its process because of its patents. This brings into issue the scope and validity of Monolith's patents. The inventor must distinctly claim the subject matter which he claims to be an invention. The function of the specification is to fully disclose and teach the invention; the function of the claim is to define the metes and bounds of the invention. White v. Dunbar, 1886, 119 U.S. 47, 52, 7 S.Ct. 72, 30 L.Ed. 303; Miner-

15a. The lime-soda-sinter process, to date, as far as appears from our record, has been used only as an adjunct to the Bayer process and as an integral portion of the so-called "red mud process." The "red mud process" is thus a combination of the Bayer process and a lime-soda-sinter process. As such it has been used with low grade bauxites as the raw material. Previously to the use of the "red mud process", the Bayer process was used only with high grade bauxites. By the use of the "red mud process" the raw material (low grade bauxites) are first put through the Bayer method and then the residue treated with a lime-soda-sinter process. Combination plants, that is plants using the Bayer process with the lime-soda-sinter process for the residue, have been built at Mobile, Hurricane Creek, East St. Louis and Baton Rouge; and Alcoa, at the time of trial was building such a combination plant, at Bauxite, Arkansas. All of these plants contemplate the use of low grade bauxites. The government owned Monolith plant was designed to use anorthosite.

16. In the past 20 to 25 years one of the projects of the Bureau of Mines has been surveying processes for production of alumina and improving our supply of raw materials.

17. The Kalunite plant and the Salem, Oregon plant, two of the four projects for which plants were built during the war used the acid process.

18. The Harleyville plant and the Monolith plant at Laramie (the other plants) used an alkaline process. The Monolith plant was the only one not subjected to some period of operation. The witness, Hillary W. St. Clair, Chief of the Alumina plant at Laramie for the Bureau of Mines, testified and the court believes that the lime-soda-sinter process has the best chance of being commercially applied.

19. Dicalcium silicate, the residue of the Monolith process of one of the main elements in cement.

als Separation v. Butte, etc., Mining Co. 1919, 250 U.S. 336, 39 S.Ct. 496, 63 L. Ed. 1019. Section 112, Title 35 U.S.C.A. Process claims are to be construed in the same manner as apparatus claims, and in either case an infringement is voided by the omission of any element or step included in the claim or by the substitution of a non-equivalent element or step. Mowry v. Whitney, 1871, 14 Wall. 620, 20 L.Ed. 860. Philadelphia Rubber Works Co. v. Portage Rubber Co., 6 Cir., 1917, 241 F. 108, 110.

■■ The proceedings before the Patent Office, which are set forth in the file wrapper of the patent in question, provide an important guide for proper interpretation of the claims of the patent. Philadelphia Rubber Works Co. v. Portgage Rubber Co. supra. "It is well settled * * * a patentee cannot successfully contend that his patent shall be construed as if it still contained the claims which were * * * rejected and withdrawn." Royer v. Coupe, 1892, 146 U.S. 524, at page 532, 13 S.Ct. 166, 169, 36 L.Ed. 1073.

Monolith was required by the court to definitely state its contentions as to its patent issues, and we treated these statements as being, in substance, pleadings. Monolith's position as to its right to exclude others based on the Anderson patent No. 2,421,918, hereinafter referred to as "Patent 918", read in part as follows:

"In patent number 2,421,918 issued June 10, 1947 claim No. 1 to exclude:

"A. Any use of earth containing silicon and aluminum with lime and soda producing alumina using a mol ratio of not less than $Na_2O:Al_2O_3$: 1.5:1; *or*

"B. Which adds bentonite *or* lime as an aid in precipitation; *or*

"C. Which adds aluminum fluoride as an aid in desilication or calcining." [Emphasis added.]

■ From the foregoing, it is apparent that Monolith's counsel misunderstood basis patent law. Obviously the word "and" should have been used in place of the word "or" Monolith could not exclude individuals from practicing the individual steps set forth in a claim. At most it could exclude others from practicing *all* the steps of a claim.

*1. Monolith's Abandoned Claims.*

Anderson and Williams, acting for Monolith filed a series of patent applications, beginning January 26, 1942, following Monolith's alleged discovery of its process in December of 1941. Five of these patent applications were abandoned.[20] These five abandoned patent applications disclosed generally the basically old lime-soda-sinter process.

(1) The first application specifically disclosed the use of *fluorine* to react with sodium. All claims were rejected by the patent office. By an amendment on 4/12/1943 the use of sugar, molasses, Karo or dextrose to prevent thickening, "setting up" or "gelling" was inserted. But by amendment of 7/14/1943, the material added on 4/12/43 was deleted.[21] Finally on 6/5/1946 an "office action" was rendered holding the application to have been abandoned.

(2) The second application filed 2/4/1942 was similar to the first but in addition describes the inclusion of a

---

20. 1. Application of Frank J. Anderson, Ser. No. 428,166 filed 1/26/42

2. Application of Anderson & Williams, Ser. No. 429,562 filed 2/4/42

3. Application of Anderson, Ser. No. 434,795 filed 3/16/42

4. Application of Anderson & Williams, Ser. No. 451,802, filed 7/21/42

5. Application of Anderson & Williams, Ser. No. 498,162 filed 8/11/43.

Anderson & Williams were employees of Monolith at Laramie, Wyoming. The two patents based on applications, other than those above, were eventually issued to Anderson & Williams, transferred thereafter to Monolith, and are referred to as the *Monolith patents.*

21. The Examiner would have required cancellation of this new matter. We assume Monolith's purpose was to establish a date of record as to the new matter set forth in the amendment.

"*lithium* compound" to assist in the process. The claims were rejected, new claims added and again rejected. An appeal was held by the Board of Appeals on 1/22/1947 to have been abandoned.

(3) The third application filed 3/16/1942 again described the lime-soda-sinter process and placed particular emphasis upon the production of Portland cement from the residue. Rejections and amendments followed. The application was abandoned on 9/16/1947.

(4) The fourth application filed 7/21/1942 describes the desilication of aluminum hydroxide by the addition of *aluminum fluoride*.[22] This application was abandoned 3/22/1944.

(5) The fifth application was described as an improvement on a process described in a previously filed co-pending application, Ser. No. 491,778 which eventually became Monolith patent No. 2,438,488, called hereafter "Monolith No. 488." An amendment of 9/5/1944 added for the first time in any of the proceedings, claims for a mol ratio of $Na_2O$ to $Al_2O_3$ of between 1.5 and 1.9. Ledyard, an official of Monolith in a supplemental affidavit dated 4/10/1946 quoted from the Strokov report dated Leningrad 1936, concerning the Russian method. The quotation showed the same mol ratio between the materials of 1.5 to 1.9, the exact ratio claimed by Anderson and Williams in their application. The application was abandoned 8/6/1947.

### 2. *The Monolith Patents.*

(a) No. '488.

The Monolith patent No. 2,438,488 was based on an application filed June 22, 1943 by Anderson and Williams, Ser. No. 491,788. The patent issued March 30, 1948. It will be hereafter referred to as Monolith patent No. '488.

The specification described a lime-soda-sinter process for the production of alumina and dicalcium silicate and referred to adding *fluorspar* (calcium fluoride) to act as a flux or catalyst during the sintering stage; that sufficient sodium be added to the sinter to obtain the mol ratio between sodium oxide $Na_2O$ and aluminum oxide $Al_2O_3$ of not less than 1.5 or more than 1.9 and that sugar be added to prevent the gelling of the sodium aluminate. It describes the addition of lime and bentonite, the bentonite to absorb and collect fine particles of silicate. The Patent office rejected all claims on March 7, 1945, citing *inter alia* the Pontoppidan patent No. 1,320,172 and the Folger patent No. 1,964,685. An amendment was made and new claims added. All claims were again rejected on June 5, 1945.

On December 1, 1945, all claims were cancelled and new claims were added. On November 26, 1946, there was a final rejection of all claims and notice of appeal was filed and further amendment was received by the Patent office on July 28, 1947 cancelling all previous claims and adding three new claims which eventually became claims 1, 2 and 3 of Patent '488.

(b) No. '918.

Monolith patent No. 2,421,918 issued June 10, 1947, was based on an application Ser. No. 554,974 filed September 20, 1944 by Anderson and Williams. The disclosure of that patent is almost identical to that of Monolith patent No. 488, with the exception of the *addition of aluminum fluoride* to the aluminum hydroxide *at the calcining stage*. All the claims were rejected on March 22, 1945. On August 9, 1945, new claims were added. On September 16, 1946, all claims were again rejected. An amendment was filed on October 10, 1946 adding two new claims setting forth for the first time the steps of the use of bentonite *and* lime. These two new

---

22. It is interesting to note that Monolith's witness, Ledyard, who testified at the trial as to the commercial feasibility of alumina by the Monolith process, filed an affidavit in this application alleging that the aluminum fluoride required in the process would cost only $48 per ton of aluminum oxide (alumina) produced. $48 per ton is greater than the entire cost per ton of alumina as testified to by plaintiff's witness, using the Monolith process.

claims became claims 1 and 2 of Monolith patent '918 allowed April 8, 1947 and issued June 10, 1947.

Considering the principles of law set forth above, and the history of the attempts of Monolith to obtain patent protection, it is apparent that the Monolith patents are of extremely limited scope. Monolith obviously tried to obtain broad protection without regard to the prior art discussed hereafter, and finally secured the allowance of the five claims. It follows that Monolith's right to exclude others in the use of its so-called process is limited to these five claims, all of which are of a detailed nature, and none of which would be infringed by a user of the lime-soda-sinter process unless all the steps in at least one of the claims was carried out by the infringer.

It is not the intention of the court to adjudicate Monolith patents as to third parties, but only to make a final adjudication between Monolith and the R. F. C. It is the court's view that Monolith's patents are invalid, but the only use of that view in deciding this case is to hold that insofar as R. F. C.'s liability is here concerned, Monolith, in pressing its theory of the fair value of its contract, would not be able to exclude others from using the processes described in the patents and that this conclusion has a substantial impact upon Monolith's contention as to the fair value of its contract.

3. *Monolith failed to prove that its so-called process was in fact covered by any of the claims of its patents.*

No attempt was made by Monolith to have the witness Williams, purportedly a co-inventor, tie in the Monolith process with the patent claims. Nor was it done by indirection. Monolith's evidence is not sufficient to establish that the Monolith process has necessarily utilized even the broadest claim of its two patents, claim No. 1 of '488. It obviously follows that Monolith has not established that its process would utilize the re-

maining narrower claims. As to Monolith's patent No. 918, both claims are limited to the use of bentonite *and* lime. This is clearly not a part of the Monolith process.

4. *The Monolith patents are so limited in scope that Monolith could not exclude others from practicing a commercially feasible lime-soda-sinter process.*

Four of the five claims of the Monolith patents included the use of sugar or molasses as a gellation inhibitor. The conclusions reached by the Bureau of Mines from studies and experiments at its testing laboratory at College Park, Maryland, were to the effect that no such inhibitors would be needed or at least would be only an alternate method to a proper control of the process. The elimination of sugar would thus eliminate infringement of four of the five Monolith claims.

The only claim which does not include the use of sugar is claim No. 1 of Monolith No. 918 patent. As previously noted, this claim is limited to the use of bentonite *and* lime in the desilication step. The Bureau of Mines did not propose to use bentonite at all and proposed to use a cheaper material in place of lime.[23]

Both claims 1 and 2 of the Monolith No. 918 patent are limited to the addition of aluminum fluoride at the calcining stage. The Bureau of Mines did not propose to use aluminum fluoride in this step.

Claim No. 3 of the Monolith No. 488 patent required the use of calcium fluoride or fluorspar. Bureau of Mines experiment at College Park indicated that fluorspar had no observable effect.

The court concludes that the lime-soda-sinter process is generally available to the public and that if proper engineering of this process was carried out the limited claims of Monolith involving sugar, fluorspar, aluminum fluoride, bentonite and lime, would not be necessary for the commercial use of the lime-soda-

---

23. The court finds the R.F.C. expert witnesses more credible than the Monolith experts.

sinter process, and that there would be no infringement of the Monolith patents. In fact production would be cheaper than under the Monolith patents, since these materials would not have to be used.

5. *The availability of the defense of fraud.*

An alleged infringer could successfully urge as a defense to Monolith's infringement suit under patent No. 488, that Monolith had been guilty of fraudulent misrepresentation in the procuring of the patent and thereby defeat Monolith's action.

It is a general rule of patent law, that where the question of invention or patentability is doubtful, commercial success may tip the scales in favor of patentability. Goodyear Tire & Rubber Co. v. Ray-O-Vac Co., 1944, 321 U.S. 275, 64 S.Ct. 593, 88 L.Ed. 721; Jungersen v. Ostby & Barton Co., 1949, 335 U.S. 560, 69 S.Ct. 269, 93 L.Ed. 235.

Apparently, to take advantage of this rule, Monolith's patent attorneys made the following representations to the Patent Office in prosecuting patent '488: That after the idea to make alumina and Portland cement was conceived, "there ensued a long course of investigation and research and a small plant was built and operated.[24] This was followed by the *erection and operation of the large plant*, the operation of which is so minutely described in the specifications" and again, "as far as we are aware, *the only large plant successfully producing high grade aluminum oxide and high grade Portland cement from Kaolin, marl or other cheap earths is our client's plant at Laramie, Wyoming*" and "we approach the problem with the knowledge that our client, working in a very old art, has *not only built a large plant but has operated it successfully and now has the only plant of its kind in the world.*" [Emphasis added.]

Even after final rejection of claims by the Examiner and a personal interview, the following statement appears in an amendment:

"The *present process is in actual commercial operation upon a large scale and is successfully and economically producing both a commercially pure alumina* suitable for aluminum metal manufacture and a high quality Portland cement low in alumina content from raw materials which are predominantly aluminous silicious material and calcium carbonate \* \* \*". [Emphasis added.]

These statements and representations were clearly false. However, the attorneys handling the patent application, were not called by Monolith, and there has been no suggestion that the attorneys knew of the falsehood, or did other than rely on advice from their clients. The pilot plant had operated only with batches put through individual units. The commercial plant involved in this lawsuit had never operated at all. We approach the problem from the standpoint of Monolith's ability to exclude others. The question is then, what defenses might be raised to an action by Monolith, based upon its patents, against alleged infringers. Clearly, fraud before the Patent office in the procurement of a patent would be such a defense, and "calls for nothing less than a complete denial of relief \* \* \* for the claimed infringement of the patent \* \* \*". Hazel-Atlas Glass Co. v. Hartford-Empire Co., 1944, 322 U.S. 238, 250, 64 S.Ct. 997, 1003, 88 L.Ed. 1250. The cases, involving suits by the United States for the annulment of a patent, U. S. v. American Bell Telephone Co., 1888, 128 U.S. 315, 9 S.Ct. 90, 32 L.Ed. 450, and others cited by Monolith, would not be in point.

On general equitable principles Monolith would be vulnerable to the defense of fraud in an action against alleged infringers, Keystone Driller Co. v. General Excavator Co., 1933, 290 U.S. 240, 54 S.Ct. 146, 78 L.Ed. 293; Preci-

24. This, obviously the pilot plant, had never operated as an integrated unit.

sion Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 1945, 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381.

6. *The claims of the Monolith '488 and '918 Patents are invalid over the prior art.*

(a) Monolith's '488.

(1) *Claim 1—'488.*

Claim 1 of the '488 patents is the broadest claim of all five claims of the two patents.[25]

Three patents, Folger No. 2,141,132, Folger No. 2,058,145 and Sherwin No. 1,422,004 show essentially all the steps set forth in the claim with the sole exception of the use of sugar, which we discuss hereafter. Folger patent—'132 discloses a lime-soda-sinter process which is basically the same as that set forth in Monolith's '488. In addition to the matter of sugar, there are other minor differences. Folger patent—'132 does not teach the specific mol ratio of between 1.5 and 1.9 at the leaching stage. The Russian Strokov article dated 1936, and to which Anderson and Williams had access at latest by April 1942, teaches the mol ratio at the leaching stage of between 1.5 and 1.9. The Monolith '488 application was filed over a year later, in June 1943.

Though none of the three basic references referred to above show *wet* grinding of the sinter, this is shown by James No. 1,926,744 which also involves the basic lime-soda-sinter process.

As to sugar, its use in Monolith '488 was apparently to prevent gellation, and there is doubt as to whether this occurred because of the instability of a sodium aluminate solution, resulting in pre-mature precipitation of aluminum hydrate, or whether it occurred because of the presence of the residue containing the principal constituent of Portland cement, alumina, silica and lime, resulting in a "setting" due to the hydraulic properties of these elements. If the former was the purpose of the use of sugar as shown in Monolith '488, Spence No. 1,157,436 teaches a method to stabilize sodium aluminate solutions and inhibit precipitation by the use of materials such as sugar, dextrine, starch, glycerine and the like. If on the other hand, the purpose of the use of the sugar was to prevent gellation caused by the presence of the residue referred to, Pontoppidan No. 1,320,172 teaches the use of sugar to retard the setting of cement.

■ "* * * to obtain the privileged position of a patent more ingenuity must be involved than the work of a mechanic skilled in the art." Cuno Engineering Corp. v. Automatic Devices Corp., 1941, 314 U.S. 84, at page 90, 62 S.Ct. 37, at page 40, 86 L.Ed. 58, and codified in the new patent law Section 103, Title 35 U.S.C.A.:

"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. * * *"

The Pontoppidan patent No. 1,320,172 does not refer to the production of alu-

25. The claim in summary is as follows: The process of producing aluminum hydroxide from a sinter which is predominantly insoluble calcium silicate and soluble sodium aluminate; and which has a mol ratio of $C_aO$ to $SiO_2$ between 1.9 and 2; and a mol ratio of $Na_2O$ to $Al_2O_3$ between 1.0 and 1.3, which process comprises; adding sufficient sodium carbonate to said sinter to provide a mol ratio of $Na_2O$ to $Al_2O_3$ between 1.5 and 1.9; and wet grinding said sinter, leaching the ground sinter; in the presence of soluble sugar in an amount between 0.2 and 2% of the weight of said sinter; to produce a sodium aluminate solution; separating the sodium aluminate solution containing said sugar and sodium carbonate from the resulting insoluble residue; treating said solution with carbon dioxide to precipitate aluminum hydroxide; and separating said aluminum hydroxide from the remaining sodium carbonate solution.

mina but refers to the art of handling slurries in the grinding of materials similar to those used by the lime-soda-sinter process.

Thus, *at best* claim No. 1 of Monolith '488 was a combination patent showing the use of an additional step in the lime-soda-sinter process involving sugar, and would not be infringed by any process which did not use sugar. On the other hand a mechanic trained in the art would have only to refer to the teachings of Spence or Pontoppidan to find the use of sugar.

### (2) Claim 2—'488.

Claim 2[26] differs from claim 1 in that it adds the step involving the use of an excess of lime in desilication of the sodium aluminate solution. The patents of Folger and Sherwin (supra) disclose the use in the lime-soda-sinter process of a desilication step, which comprises autoclaving under heat and pressure.

Kayser 708,561 teaches the use of lime without reference to an "excess." Stohr 1,978,823 and Archbald 2,420,852 involve the lime-sinter and a lime-soda-sinter process respectively, and the addition of an excess of lime to the sodium aluminate in the desilication process. No inventive genius is shown in claim 2.

### (3) Claim—Monolith—'488.

Claim 3[27] differs from claim 1, in that it refers to the making of Portland cement as well as alumina and provides for the addition of calcium fluoride (fluorspar) to the raw materials, and the addition of clay and lime in desilicating. The production of both alumina and residue for Portland cement is taught by the Folger '132 and the Sher-

---

26. The steps of the claim are in summary form as follows: The process of producing aluminum hydroxide, which comprises, forming a sinter which is predominantly insoluble calcium silicate and soluble aluminate; and which has a mol ratio of $C_aO$ to $SiO_2$ between 1.9 and 2; and a mol ratio of $Na_2O$ to $Al_2O_3$ between 1.0 and 1.3 adding sufficient sodium carbonate to said sinter to provide a mol ratio of $Na_2O$ to $Al_2O_3$ between 1.5 and 1.9; and wet grinding said sinter; leaching the ground sinter; in the presence of soluble sugar in amount between 0.2 and 2% of the weight of said sinter to produce a sodium aluminate solution; separating the sodium aluminate solution containing said sugar and sodium carbonate from the resulting insoluble residue; removing residual silicates from said solution by treating said solution with an excess of lime over that required to combine with said residual silicates; and separating the resulting precipitate from the remaining solution; treating the remaining solution with carbon dioxide to precipitate aluminum hydroxide; and separating said aluminum hydroxide from the remaining sodium carbonate solution.

27. The steps of the claim are in summary form as follows: In a process for making Portland cement low in alumina content; and for recovering commercially pure alumina from raw materials one of which is predominantly aluminous silicious material and the other of which is predominantly calcium carbonate; the steps which comprise, forming a mixture of said raw materials; and an amount of calcium fluoride between ½ and 3% of the weight of said raw materials; to provide a mol ratio of $C_aO$ to $SiO_2$ between 1.9 and 2, wet grinding said mixture to form a slurry which is subsequently dried and sintered; adding sufficient sodium carbonate to the mixture before it is sintered to provide a mol ratio of $Na_2O$ to $Al_2O_3$ between 1.0 and 1.3; sintering the resulting mixture to drive off carbon dioxide and provide a sinter which is predominantly sodium aluminate and calcium silicate; adding sufficient sodium carbonate to said sinter to provide a mol ratio of $Na_2O$ to $SiO_2$ between 1.5 and 1.9; and wet grinding said sinter; leaching said ground sinter; in the presence of soluble sugar in an amount between 0.2 and 2% of the weight of said sinter; to produce a sodium aluminate solution containing said sodium carbonate and said sugar; and leave a residue which is predominantly calcium silicate suitable for cement manufacture, treating said solution with lime and clay to remove residual silicates; and then with carbon dioxide to precipitate aluminum hydrate, separating said precipitated aluminum hydrate from the remaining solution and converting the same to alumina.

win patents (supra) as well as many others.

Archbald 2,420,852 teaches the use of lime and *slime*. Slime is obviously an equivalent of the clay. It enters into no chemical reaction but offers a large amount of surface on which the precipitate may collect.

 Nor is the use of fluorspar, functioning as a flux, now in the art. Tyrer (British) 172,087 and Coles, 2,-283,849, both taught the similar use of fluorspar. A combination patent is not valid, if it appears that all of the claimed elements are found in different prior patents in the art, and no new functional relationship arises from their combination. The Monolith process results from "mere aggregation of \* \* \* old devices, and not from invention or discovery." Toledo Pressed Steel Co. v. Standard Parts, Inc., 1939, 307 U.S. 350, 356, 59 S.Ct. 897, 899, 83 L.Ed. 1334; Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 1950, 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162; Photochart v. Photo Patrol, Inc., 9 Cir., 1951, 189 F.2d 625, 627–628, certiorari denied 342 U.S. 867, 72 S.Ct. 107, 96 L.Ed. 652, rehearing denied 342 U.S. 907, 72 S.Ct. 290, 96 L.Ed. 679; Jacuzzi Bros. v. Berkeley Pump Co., 9 Cir., 1951, 191 F.2d 632, 637.

(b) Monolith's '918.

*(1) Claim 1—'918.*[28]

The only new matter in Monolith's '918 patent over the '488 patent, is the addition of aluminum fluoride at the calcining stage to form silicon tetrafluoride. Folger—'132 and Sherwin (supra) teach the basic lime-soda-sinter process claim. Kayser and Archbald (supra) disclose the initial desilication stage and Archbald (supra) teaches the precipitation of silica by heat and pressure in the presence of lime and slime.

Childs 1,036,454 discloses the addition of aluminum fluoride to the raw material and the eventual forming of silica tetrafluoride, which passes off as a gas. Chappell 1,079,899 discloses the use of hydrofluoric acid which under high temperature combines and forms silicon tetrafluoride. This is obviously an equivalent step to that shown in Monolith '918.

*(2) Claim 2—'918.*

Claim 2 of Monolith '918 is the same as claim 1 except for the addition of sugar. We have heretofore discussed the sugar step.

7. *Monolith's process infringes.*

The Monolith process infringed the Scheidt patent No. 1,971,354, which did not expire until August 28, 1951.

28. The steps of the claim in summary form are as follows: A process of treating naturally occurring earths, such as kaolin, marl, and other earths containing silicon and aluminum, for the purpose of producing aluminum oxide, which comprises: forming a slurry by mixing said earth, a calcium compound, and an alkali-metal carbonate with water; said carbonate being supplied in sufficient amount to produce a mol ratio of not less than $Na_2O : Al_2O_3 : : 1.5 : 1$ in the slurry; heating the slurry for a time and at a temperature sufficient to drive off the water and to form a sinter containing silicon, calcium, aluminum, and the alkali-metal; grinding the sinter to permit ready leaching; leaching said sinter with water containing an alkali-metal carbonate* for a sufficient period to take into solution all water-soluble material in said ground sinter; subjecting the solution so formed to heat and pressure; in the presence of bentonite and lime; to precipitate from the solution a large proportion of the silica initially present in said solution; removing the precipitated silica from said solution; carbonating the solution obtained by said leaching; separating from said carbonated solution water-insoluble solids produced by said carbonation; adding to said solids sufficient aluminum fluoride to combine with any résidual silica in said solids to form silicon tetrafluoride; and calcining the mixture of said solids, and silicon tetrafluoride at sufficiently high temperature and for a sufficient time to form and vaporize said silicon tetrafluoride which is allowed to escape from the solids; and simultaneously to convert aluminum hydroxide to aluminum oxide.

\* Claim 2—same as No. 1, except here added "and sugar."

Scheidt disclosed the lime-soda-sinter process and R.F.C.'s patent expert read Scheidt's claim 1, step by step on the Monolith process described in Monolith's '488.

There would of course be a serious question of the validity of the Scheidt patent in view of the prior art, but the apparent infringement of the earlier patent would have been a further stumbling block in Monolith's way in attempting to preempt the field in making of alumina and cement as shown by the testimony of other witnesses.

We conclude that the Monolith patents were invalid. If any value at all resided in them, it rested on the steps of adding sugar or similar substances, or fluorspar, or lime *and* clay, and that according to expert testimony offered by R.F.C. these additional steps were not necessary to a successful operation of the lime-soda-sinter process, old in the art. At the very best, therefore, Monolith's claims were exceedingly narrow and its patents, even if valid, could have been voided by the elimination of any of the alleged new steps in the process.

Moreover, Monolith faced the possible charge of infringing the Scheidt patent between 1946 and 1951.

8. *No Estoppel runs against R.F.C.*

Monolith contends that R.F.C. is estopped to raise the prior art or to question the validity of the Monolith patents. But Monolith has brought the patent issues into the case. Monolith's theory, that the "value of the contract" is included within fair compensation, was predicated upon the theory that its patents were valid, and that it could restrain competition. The testimony of Dr. Babcock and others was entirely predicated upon the validity of the Monolith patents. Having brought the issue into the case, may Monolith now raise the doctrine of estoppel to prevent R.F.C. from showing the invalidity of the patents?

Monolith's entire position proceeds from the premise that R.F.C. by its voluntary act, terminated the contract. It overlooks the compulsion of the Reconversion Act. As we have previously stated, R.F.C. terminated the contract pursuant to the mandate of Congress after being advised by the Office of War Mobilization that the performance of the contract was no longer needed for the prosecution of the war. R.F.C.'s act, far from being a voluntary one, was pursuant to statute, and in substance was a clerical act carrying out the provisions of the statute.

Monolith's cases on estoppel are not in point. In the ordinary patent litigation, "neither a licensee nor an assignee may dispute the validity of the patent in a suit for royalty." Reynolds Metals Co. v. Skinner, 6 Cir., 1948, 166 F.2d 66, 73. U. S. v. Harvey Steel Co., 1905, 196 U.S. 310, 318, 25 S.Ct. 240, 49 L.Ed. 492. But that is not the problem here. The question is, might other competitors assert invalidity of the patents, and R.F.C. has demonstrated that they might.

Nor is Eclipse Bicycle Co. v. Farrow, 1905, 199 U.S. 581, 26 S.Ct. 150, 50 L.Ed. 317, controlling. Conceding that the case stands for the rule contended for by Monolith, that where parties contract with reference to a particular object or invention, and are only secondarily concerned with the patent thereon, they impliedly waive reference to the prior art, as limiting the scope of the object or invention contracted for, and the case still does not control because of what has been said heretofore as to the reason for termination.

Estoppel is an equitable doctrine, and there is no equity in allowing Monolith to claim that by its patents it might restrain competition, and at the same time contend that R.F.C. may not show the defense of invalidity which others could raise to the patents, merely because R.F.C. complied with a statute of the United States.

**E. Alternate holding as to the value of Monolith's contract.**

The court is now prepared to make its alternate holding as to the value of Monolith's contract at the time of termination.

Stripped of generalities and fancy talk as to the value of this contract, it is apparent from the foregoing that this contract had little, if any value to Monolith. Judging the question by what a willing purchaser would have paid, it becomes obvious that at best Monolith would have had a 90 day test run of its process; that it would have been faced with major problems in integrating its process on a commercial scale and simultaneously integrating that process with the production of cement. It might well have been first in the field, but it would have been faced with finding an outlet for its alumina products with no assurance that the major purchasers of alumina would buy them and put them through their reduction plants. Monolith would then have been faced with the necessity of building a reduction plant.

Meanwhile, it would have been competing with other known and tested methods for the production of alumina from low grade ores, including the well known lime-soda-sinter process, and the lime-sinter process tried out at the Harleyville plant.

Nor would it have had success in restraining others from the use of its alleged process. In any court action it would have been faced with the charge of fraud, based on the representations to the Patent Office, with the facts on which to base such charge available in the public records of the Patent Office.

██ It would have met with opposition based upon its abandoned claims, and the Russian Strokov report of 1936 to which Williams and Anderson had access in April 1942. It would have met with a probable holding that its patents were invalid and in any event, were restricted to very narrow claims in a crowded field, involving the use of sugar, fluorspar, bentonite and lime. The elimination of any of such steps by a competitor would of course free it from a charge of infringement. The value of the contract then, instead of being a valuable right, was a most dubious one, and one which could have well involved Monolith in fruitless and costly litigation. The court feels it is being extremely generous in fixing the value of the contract, at the time of termination, at the sum of $25,000. This is of course, the alternate holding of the court. In point II supra, we hold that Monolith is entitled only to its reimbursibles.

**IV.**

**"REIMBURSABLES."**

**Disallowed items of Monolith's claim filed with R.F.C., now in dispute.**

The problem of reimbursables is a difficult one, but the parties have simplified the problem by their stipulations. We start with the premise that the findings of R.F.C. are "prima facie correct," Settlement Act, § 13(c) (3), 41 U.S.C.A. § 113(c) (3). We have before us (1) the claim filed by Monolith with R.F.C. for $635,381.26 on 1/18/50; (2) the findings and determinations of R.F.C. on such claim issued 6/7/50 in which R.F.C. allowed Monolith $109,322.49 of the claim; (3) a so-called "reimbursables stipulation" entered into between the attorneys, identifying and breaking down the various items, showing separately the claim for interest, attorneys' fees, etc., and in which Monolith waives some small part of its claims; (4) a supplement to the reimbursables stipulation, and (5) Ex. AY prepared by R.F.C. to graphically illustrate the problem. This exhibit was submitted to Monolith for approval but Monolith would not or did not approve it. We find it substantially correct.

Pursuant to these five documents, we break down the claim of Monolith as follows:

Mono. claim for "reimbursables" filed with R.F.C. $635,381.26

Allowed by R.F.C. (not in dispute herein) 109,322.49

Bal. 526,058.77

Claims waived by Mono. by stipulation 695.67

Bal. 525,363.10

Claims for int. at 7%, $137,384.34 plus $2,057.25 claimed as int. at 7% as a "test plant cost" (We consider *Interest* under sep. heading hereafter) $139,441.59

Balance now in dispute, excluding interest 385,921.51

Discrepancy of $1.00 from Reimbursables stipulation 1.00

$385,922.51

For further consideration of this claim of $385,921.51 we break it down into the following items and consider each in order.

| | Now claimed | Allowed by R.F.C. | Here in dispute | |
|---|---|---|---|---|
| 1. *Legal Expense* | $124,492.87 | $ 302.00 plus 107.19 RR fare | | $124,083.68 |
| 2. *Exec. Salaries* | | | | |
| "C & A" program | 109,816.31 | 51,489.65 | | |
| Direct Expense | 95,262.61 | – | | |
| | 205,078.92 | 51,489.65 | | 153,589.27 |
| 3. *C & A program* | | | | |
| (excl. salaries and interest) | | | | |
| (a) Mono.LA office payrolls | 25,749.60 | 23,904.98 | | |
| 1. PBX operator | | | 501.20 | |
| 2. Eng. Dept. | | | 1,343.42 | |
| (b) Payroll taxes | 986.55 | 613.23 | 373.32 | |
| (c) Travel exp. & Wash. office expense | 8,766.79 | 7,030.13 | 1,736.66 | |
| (d) Misc. expense | 1,581.12 | 1,018.62 | 562.50 | |
| (e) Land | 200.00 | – | 200.00 | |
| (f) Test plant (excl. interest) | 36,095.27 | – | 36,095.27 | |
| | | | | 40,812 37 |
| 4. *Direct exp. program* | | | | |
| (excl.sal. & interest) | | | | |
| (a) LA office payroll 7/26/46 to 6/27/47 | 2,144.11 | 2,030.90 | | |
| PBX operators | | | 113.21 | |
| (b) LA off. payroll disbursed after 6/26/47 | 1,877.23 | – | 1,877.23 | |
| (c) Laramie payroll | 9,879.15 | 9,199.04 | 680.11 | |
| (d) Payroll taxes | 752.97 | 486.16 | 266.81 | |
| (e) Expense accts. | 2,403.72 | 131.66 | 2,272.06 | |
| (f) Off. supplies & misc. | 1,500.70 | 366.85 | 1,133.85 | |
| | | | | 6,343.27 |

| | Now claimed | Allowed by R.F.C. | Here in dispute |
|---|---|---|---|
| 5. *M & O program* (excl. interest) | | | |
| (a) Coy Burnett & Miss " exp. | $ 265.64 | $ 136.82 | $ 128.82 |
| (b) Supervision fee | 29,000.00 | 12,000.00 | 17,000.00 |
| (c) Laramie payroll & taxes after 6/14/47 | 16,396.17 | – | 16,396.17 |
| (d) LA payroll & taxes after 7/31/47 | 419.34 | – | 419.34 |
| (e) Rental, off. space after 7/31/47 | 5,014.00 | – | 5,014.00 |
| (f) Rental, off. mach. after 7/31/47 | 2,436.00 | – | 2,436.00 |
| (g) Typewriter serv. after 10/14/46 | 47.00 | – | 47.00 |
| | | | 41,441.33 |
| 6. Protection & Maintenance program after 2/25/47 | 19,652.59 | – | 19,652.59 |
| | | | $385,922.51 |

### 1. Legal Expense.

The claim filed with R.F.C. for "legal expenses" was for $137,884.97. $12,744.08 of this amount was for interest on the claim. (We consider the interest problem under separate heading hereafter.)

This left $125,140.89. By their stipulation, the parties have adjusted this figure to $124,492.87.

Although termed "legal expenses" the Monolith claim made to R.F.C. as modified by stipulation is as follows:

| | Claim to R.F.C. | Claim as modified by Stipulation |
|---|---|---|
| Paid to attorneys | $73,564.28 | $73,479.54 |
| *Legal costs & expenses* | | |
| Misc. expenses incurred & paid, such as Steno. services, Tel. & Tel., Off. supplies, printing & misc. court costs | 7,102.87 } | 9,370.89 |
| Misc. Direct Court expenses | 2,233.02 } | |
| Services rend. by Architect, Engineers, The Dorr Co. Inc. & construction contractor, Peter Kiewit & Sons | 1,825.84 | 1,825.84 |
| Services of Auditors, Arthur Anderson & Co. | 3,785.00 | 3,785.00 |
| Bond expense | 4,010.00 | 4,010.00 |
| Expenses of F. J. Anderson, H. D. McBride, D. R. Williams & W. A. Gillette | 23,407.49 | 23,407.49 |

| | Claim to R.F.C. | Claim as modified by Stipulation |
|---|---|---|
| Office rental, Rm. 913 Spring Arcade Bldg. | $ 1,610.00 | $ 1,610.00 |
| Salaries & wages (McBride's secy. etc.) | 1,960.13 | 1,960.13 |
| Transportation | 4,835.60 | |
| Freight charges | 806.66 | 5,043.98 |
| | (51,576.61) | (51,013.33) |
| | $125,140.89 | $124,492.87 |

Of the claim, the R.F.C. by its findings, allowed $302 as attorneys' fees and $107.19 as legal costs and expenses. This leaves in dispute $124,083.68.

§ 6(d) of the Settlement Act, 41 U.S. C.A. § 106(d), provided in part: " * * the methods and standards established under * * * this section for determining fair compensation for termination claims which are not settled by agreement shall be designed to compensate the war contractor fairly for the termination of the war contract, taking into account * * * (3) *reasonable accounting, legal, clerical, and other costs and expenses incident to termination and settlement of the terminated war contract;* * * * ", and provides further, "The following shall not be included as elements of cost: (i) * * * fees and other expenses in connection with * * prosecution of Federal income-tax claims or *other claims* against the Government (except as provided in paragraph (3) above) * * *." [Emphasis added.]

Thus, the question presented is whether Monolith's claims for legal fees and expenses are "incident to termination and settlement of the terminated war contract".

§ 4 of the Settlement Act, 41 U.S.C.A. § 104, provided:

"(b) In order to insure uniform and efficient administration of the provisions of this chapter, the Administrator of General Services, subject to such provisions, by general orders or general regulations—

"(1) shall prescribe policies, principles, methods, procedures, and

standards to govern the exercise of the authority and discretion and the performance of the duties and functions of all Government agencies under this chapter; and

"(2) may require or restrict the exercise of any such authority and discretion, or the performance of any such duty or function, to such extent as he deems necessary to carry out the provisions of this chapter.

"(c) * * * Each Government agency shall carry out such orders and regulations of the Administrator of General Services expeditiously, and shall issue such regulations with respect to its operations and procedures as may be necessary to carry out the policies, principles, methods, procedures, and standards prescribed by the Administrator of General Services. * * *"

Pursuant to this statutory authority regulations were issued. Office of Contract Settlement, Regulation No. 5, (9 FR 12282) reads in part as follows:

"Pursuant to the authority conferred upon me by § 4(b), 6, and 20 (d) of the Contract Settlement Act of 1944, the following policies, principles, methods, procedures and standards, are prescribed to govern the provision of fair compensation to war contractors for the termination of fixed-price-war supply contracts;"

"2.1(k) Settlement expenses: Reasonable accounting, legal, clerical and other expenses necessary in connection with the termination and settlement of the contract and sub-

contracts and purchase orders thereunder, including expenses incurred for the purpose of obtaining payment from the Government only to the extent reasonably necessary for the preparation and presentation of settlement proposals and cost evidence in connection therewith.

"3. Excluded costs: Without affecting the generality of the foregoing provisions in other respects, amounts representing the following should not be included as elements of cost:

"(a) Losses on other contracts, or from * * * prosecution of Federal income-tax claims or other claims against the Government (except as provided in paragraph 1(k)) * * *"

Thus, these regulations permit recovery only of fees and expenses incurred in preparing and presenting settlement proposals and cost evidence thereon and exclude fees and expenses in attempting to obtain payment from the government.

Office of Contract Settlement, Amendment to Regulation No. 14 Revised and Re-issued, "Termination cost memorandum No. 11", dated March 30, 1946, (11 FR 3896) reads in part as follows:

"1. *Reference to statement of Cost Principles*. The statement provides for the inclusion of settlement expenses and costs of protection and disposition of property as follows (subpars. 1(k) and (1) ) ;

" 'Settlement Expenses. Reasonable accounting, legal, clerical and other expenses necessary in connection with the termination and settlement of the contract and subcontract and purchase orders thereunder, including expenses incurred for the purpose of obtaining payment from the Government only to the extent reasonably necessary for the preparation and presentation of settlement proposals and cost evidence in connection therewith.'

"2. *Definitions*. a. The costs and expenses covered by subparagraph 1(k) and (1) of the Statement of Cost Principles include such items as are incident to effecting terminations, termination settlements, and the protection and disposition of property acquired or produced for the contract and on hand at the date of termination. They do not include (1) the cost of idle equipment, facilities, and personnel and (2) accounting, legal, clerical, and other costs and expenses incurred by a prime contractor or a subcontractor in any formal appeal or submission, either within a contracting agency or to the Appeal Board of the Office of Contract Settlement, or in any arbitration, mediation, or suit in court, where such proceeding is instituted by such contractor for the purpose of obtaining payment in excess of the settlement amount determined to be due by the Government or an intervening higher tier contractor * * *".

In Piggly Wiggly Corp. v. U. S., 1949, 81 F.Supp. 819, 828, 829, 112 Ct.Cl. 391, the Court of Claims held that these regulations precluded recovery of the costs and expenses of an appeal under the Contract Settlement Act, even where the appealing contractor was permitted a recovery in excess of that allowed by the government agency. In Edelman v. U. S., 1950, 91 F.Supp. 729, 117 Ct.Cl. 400, the Court of Claims did not permit recovery for other arbitration costs which the plaintiff had incurred, 91 F.Supp. at page 731, since arbitration was not required as a condition precedent to settlement.

To the contrary is Walsh Construction Co. v. Davis, 1948, 204 Miss. 509, 37 So. 2d 757. It does not appear from the decision whether the regulations referred to above were cited to the court.

A survey of the entire Act indicates that Congress advisedly used the phrase, "incident to termination and settlement of the terminated war contract", § 6(d) (3) of the Settlement Act, 41 U.S.C.A. § 106(d) (3). It had defined in § 3, 41 U.S.C.A. § 103, the words "termination," "terminate" and "terminated" as referring to the termination or cancellation of work under a prime contract for the con-

venience or at the option of the government. It also defined the term, "termination claim" as meaning *"any claim or demand by a war contractor for fair compensation for the termination of any war contract and any other claim under a terminated war contract, which regulations prescribed under this chapter authorize to be asserted and settled in connection with any termination settlement."* [Emphasis added.]

§ 6 of the Act, 41 U.S.C.A. § 106, provided a basis for the settlement of termination claims and provided settlement would be conclusive. The section sets up in detail (quoted in part supra) matters to be allowed as costs and those to be excluded as costs.

§ 13 of the Act, 41 U.S.C.A. § 113, provided for "Appeals" and provided for situations where there was a failure to settle claims by agreement; and provided for preparation of findings.

■ Thus, Congress clearly had in mind, (1) the amicable settlement of terminated war contracts, and (2) findings and appeals in those cases in which no settlement was reached. It did not use the word "appeals" in § 6(d) (3) nor did it in § 6 make any reference to including the costs and expenses of appeals as part of the war contractors' claim. We conclude that Congress did this advisedly, as it had a right to do. Since it was removing the bar of sovereign immunity to proceedings on appeal from the findings on a war contractor's claim, it had a right to provide or not provide for the inclusion of attorneys' fees and legal costs. It chose not to so provide.

Finally, § 13, 41 U.S.C.A. § 113, of the Act, permits appeals to (1) the Appeal Board, (2) the Court of Claims and (3) in certain cases to a State or Federal court. The Appeal Board was especially created to avoid the flooding of the courts with such cases. No provision was made for permitting the Appeal Board to grant costs and expenses of appeal. It follows that Congress did not intend that the Court of Claims or the State or Federal courts might allow such costs and expenses of an appeal. Otherwise litigants would in a majority of cases, pursue a court remedy rather than proceedings before an Appeal Board.

The Court of Claims has expressly held that it may not allow costs, expenses or attorneys' fees on the appeal. It would be an anomalous situation if the District Court did so allow such items.

■ We conclude that Monolith is not entitled to its legal fees or its legal costs and expenses in connection with this proceeding or its prior litigation and is limited to such legal fees and costs as it may prove were "incident to termination and settlement of the terminated war contract." This would include the preparation and the prosecution of the termination claim, the organization and presentation of cost evidence, in connection therewith, the presentation of settlement negotiations and the actual handling of negotiations carried on in good faith to effect settlement under the terms of the Settlement Act.

We now apply these legal principles to the factual problems before us. The burden was upon Monolith to show for what services these legal fees were paid. The only showing made by Monolith was a breakdown by periods of time, from May 1942 through December 1952, as shown on Ex. 104B. This Exhibit shows the following:

| | Legal fees & Attys. Expenses | Court costs & Misc. legal Exp. |
|---|---|---|
| I. May 1942 until July 25, 1946 (date of stopwork order) | $ 50.00 | – |
| II. July 26, 1946 to Oct. 31, 1946. (Oct. 14, 1946 was effective date of term. of contract) | 2,234.00 | – |

III. Nov. 1, 1946 to May 31, 1947. (By this date all work in close-down & for the "standby" of the plant had been completed) — 13,695.63 — 316.90

IV. June 1, 1947 to May 31, 1950. (On May 22, 1950, injunction obt. by Mono. was dissolved & R.F.C. took possess. of plant) — 70,670.81 — 17,310.00

V. June 1, 1950 to Dec. 31, 1952. (Last date during trial for which list of disbursements filed) — 121,090.89 — 15,091.44

It will be noted that this breakdown by Monolith *covers not only their claim for legal fees and expenses, contained in its claim filed with R.F.C., but also claims for legal fees incurred thereafter.*[29] Obviously Monolith cannot recover on claims not filed with R.F.C. Monolith's request for findings by R.F.C. was filed on January 18, 1950 and findings were issued by R.F.C. on June 7, 1950. Monolith has not exhausted its administrative remedy on these latter claims and they are without the scope of the Settlement Act and the Reconversion Act.

We have discussed this problem heretofore. Thus, these latter claims in category V, subsequent to June 1, 1950, are eliminated from consideration.

As to the remaining items, there was no showing by Monolith as to what portion of the legal fees and legal expenses were concerned with the presentation of the termination claim and the negotiations in connection therewith.

R.F.C.'s findings state, in referring to the fees paid to attorneys (the claim then totaling $73,564.28) as follows in its findings (our Ex. N, p. 56; Ex. E 20, to R.F.C. Findings):

"Except for $302.00 of the $20,-558.96 paid to J. T. Enright, *an examination of the invoices submitted*

---

29. Monolith recognizes no termination point in its claims. In February 1953, during the trial, it offered its Ex. 104B bringing its claims for alleged "reimbursables" down through December 31, 1952. Its total claim, as of that date for "reimbursables" was $891,697.57 and its claims for interest $283,490.34 figured at 7% or $101,246.56 figured at 2½%. It was then claiming as part of this accumulating total, among others, the following items:

(1) Attorneys' fees of the current trial of this case; (2) fees charged it by its expert witnesses; (3) expenses of all witnesses at the trial; (4) McBride's salary at $500 per mo. as Manager of the "project"; (4) President Burnett's pro-rata salary at $2,260.45 per mo.; (5) a portion of the salary of his daughter and social companion at $269.96 per mo.; (6) the "M & O" fee at $500 per mo. ($6,-000 minimum per year); (7) the cost of the daily transcript of the trial.

The fantastic and unbelievable nature of these claims are only exceeded by portions of the claims filed with R.F.C. There Monolith claimed, among others, the following items:

(1) $2,092 paid to the Burns Detective Agency for an investigation of Graham, D.P.C. engineer; (2) the cost of law books on Federal Procedure and Contracts purchased by one of its attorneys; (3) $225.66 for flowers, car rental etc., in connection with the funeral of a Monolith attorney; (4) flowers, candy, tuxedo rental; (5) expenses of wives and children of Monolith officials, when travelling.

Coy Burnett, President of Monolith, is an attorney. From his testimony on the witness stand, it became apparent he was an executive of the old school. He has master-minded and controlled this litigation. He has long been inactive in the practice of law, engaged in making cement. The court attributes these claims to Coy Burnett and not to eminent counsel who appeared in the case for Monolith.

*by the attorneys* discloses that the fee paid to said attorneys, except Harry Slattery, were for services rendered in connection with the litigation against Reconstruction Finance Corporation hereinbefore referred to. With respect to the invoices rendered by Harry Slattery, they merely state "Professional Services Rendered." No further information regarding Mr. Slattery's services has been furnished by Monolith although same had been requested." [Emphasis added.]

Monolith did not produce or offer in evidence in this court, the invoices submitted by the attorneys referred to by R.F.C. We presume that the R.F.C. findings are prima facie correct. On this basis therefore, we presume that only $302 of this vast amount of attorneys' fees were billed to Monolith for services in connection with the termination proceedings of the contract in presenting the claim to R.F.C. or in conducting negotiations.

Monolith's opening brief states, page 199–200;

"The $70,670.81 expenses for attorneys" (incurred before May 31, 1950) "was primarily incurred in preparing for the trial that was to occur in the month of January 1948 * * *". "Plaintiff has not attempted to segregate the expenses for attorneys incurred in defending the Motion to Dismiss, from the legal expenses in prosecuting its claim." Monolith's references are to the prior court action.

Obviously, the major portion of these legal fees and expenses claimed by Monolith concerned its prior litigation detailed heretofore,[30] and this would be particu-

---

30. The chronology of this litigation is as follows:

1946

| | |
|---|---|
| 9/14/46 | Monolith received notice of termination. |
| 10/14/46 | Effective date of termination. |
| 11/ 8/46 | Monolith filed complaint in Superior court in prior litigation. |
| 11/ 8/46 | Complaint and Summons served on R.F.C. together with an order to show cause re preliminary injunction. |
| 11/14/46 | Stipulation entered into between R.F.C. and Monolith not to change or interfere with the status quo of the alumina plant pending trial. Stipulation terminable on 20 days notice. |
| 11/22/46 | Action removed to U. S. District Court, became No. 6082–B. |

1947

| | |
|---|---|
| 11/15/47 | R.F.C. filed answer. |
| 2/19/47 | Monolith filed motion for preliminary injunction. |
| 2/25/47 | Restraining order stipulated to, maintaining status quo and preventing Monolith's ouster from plant; R.F.C. given right to move at any time to be relieved from order. |
| 5/21/47 | R.F.C. filed motion to be relieved of stipulation and to set aside restraining order. |
| 6/ 9/47 | Monolith filed and served motion to continue restraining order and motion for summary judgment. |
| 9/30/47 | Motion for summary judgment denied; motion to continue restraining order granted. |
| 11/20/47 | R.F.C. moved to vacate restraining order; in alternative for security. |

1948

| | |
|---|---|
| 1/ 2/48 | Monolith filed motion to dismiss. |
| 1/20/48 | Hearing on motion to dismiss. |
| 1/28/48 | Motion to dismiss granted. |
| 2/10/48 | Monolith filed objection to proposed judgment and dismissal. |
| 2/17/48 | Monolith moved for rehearing on motion to dismiss and for interlocutory injunction pending appeal to the Ninth Circuit. |

larly true of the approximately $102,000 claimed in categories III and IV above, for legal fees and court expenses for the period from November 1, 1946 to May 31, 1950. The prior action for breach of contract and injunction was instituted in the state court, removed to this court, various proceedings had, and the action was dismissed. An appeal was taken to the Circuit which affirmed and certiorari was denied by the Supreme Court. Monolith either ignored or was mistaken as to its remedy and at that time was not proceeding under the Contract Settlement Act. The decision of the Circuit and the denial of certiorari disposed of the case. There is no rhyme or reason for allowing Monolith any portion of attorneys' fees or legal expenses which might be allocated to this prior litigation, even if the record was in such shape as to show definitely such an allocation.

Thus, Monolith has made no attempt to segregate its claims and to show its "reasonable accounting, legal, clerical, and other costs and expenses incident to termination and settlement of the terminated war contract", § 6(d) (3) Contract Settlement Act, 41 U.S.C.A. § 106 (d) (3).

The Settlement Act also provided for expenses of settlement or negotiation of the termination claims, § 6(d) (3) supra, 41 U.S.C.A. § 106(d) (3), but obviously the Act referred to settlement of the type of claim permitted under the Contract Settlement Act. Monolith did not negotiate for such a settlement and does not contend it ever did.[31] It relied on a common law remedy for breach of contract. Monolith was admittedly interested in getting possession of the plant and testing its process. The court finds Monolith had no intention of negotiating a settlement within the terms of the Act. Nor did Monolith ever present a claim to R.F.C. for expenses of negotiation. This was a condition precedent to the claiming of such expenses in an appeal or proceeding under § 13 of the Act, 41 U.S.C.A. § 113.

What has been said about attorneys' fees applies also to legal expenses. There has been no attempt by Monolith to allocate any of them to either (1) the preparation, filing and prosecution of its ter-

1949

| | |
|---|---|
| 1/25/49 | Monolith's motion denied; judgment of dismissal signed and entered. |
| 1/31/49 | Monolith files motion for appeal. |
| 2/10/49 | Injunction issued by District Court pending appeal Bond $200,000. |
| 12/21/49 | Circuit affirms District Court's dismissal, 178 F.2d 854. |

1950

| | |
|---|---|
| 1/12/50 | Circuit court ordered injunction in effect pending certiorari; same bond. |
| 1/18/50 | Monolith filed claim with R.F.C. |
| 1/ /50 | Monolith petitions for certiorari. |
| 4/10/50 | Certiorari denied by Supreme Court, 339 U.S. 932, 70 S.Ct. 668, 94 L.Ed. 1352. |
| 4/17/50 | Ninth Circuit issues Mandate. |
| 4/24/50 | Beginning of settlement negotiations on the filed termination claim. |
| 5/ 8/50 | Rehearing on petition for certiorari denied by Supreme Court, 339 U.S. 954, 70 S.Ct. 839, 94 L.Ed. 1367. |
| 5/22/50 | Monolith surrendered possession of plant to R.F.C. |
| 6/ 7/50 | R.F.C. issues findings on termination claim. |
| 6/16/50 | Complaint in present action filed in Superior Court and served on R.F.C. |

31. The effective date of termination was 10/14/46. Monolith filed its first action 11/8/46. The Circuit court affirmed the dismissal on 12/21/49, 178 F.2d 854. In January 1950 Monolith petitioned for certiorari. On January 18, 1950, Monolith filed its claim with R.F.C. On April 10, 1950 the Supreme Court denied certiorari. 339 U.S. 932, 70 S.Ct. 668, 94 L.Ed. 1352.

On April 24, 1950, the first meeting on negotiations occurred. The complaint in the present action was filed June 16, 1950. The trial record of the purported negotiation meetings between these dates fully supports the finding that Monolith had no intention of negotiating a settlement within the terms of the Contract Settlement Act.

mination claim with R.F.C., or (2) to any attempt to negotiate a settlement made under the terms of the Act. An analysis of the individual items show the absurdity of many of them.[32]

The court has carefully considered the detailed findings made by R.F.C. (our Ex. N, p. 56 to 60; Ex. E 20 to E 30 inc. of R.F.C. Findings) and we find R.F.C. was correct. No evidence which would assist in allocation or segregation has been offered in this court and from Monolith's brief (supra) we assume it disclaims any such attempt.

### 2. Executives' Salaries.

Monolith is now claiming after adjustments made by the stipulations, the sum of $205,078.92 as Executives' salaries under; (1) the "C & A" program, which ended 2/1/1945, and (2) Direct expense program. The "Direct Expense Program" was intended to cover expenditures resulting from the stopwork order of July 25, 1946, and to cover the closing down of the project as a result of the termination of the contract. Monolith was instructed prior to June 26, 1947 to discontinue incurring expenses under this program and in this connection. The Direct Expense Program would at best cover the period from July 25, 1946 to June 26, 1947. R.F.C. concedes that the salaries claimed were paid by Monolith, but questions the propriety of charging them to the project.

*"C & A" claim for executives salaries.*

Monolith claims for executives' salaries under the "C & A" Program, $109,-816.31. $91,049.34 of this was for the salary of Coy Burnett, its President. By R.F.C. findings, Monolith was allowed $51,489.65 for its executives, for all programs.

The contract as originally drawn expressly prohibited any reimbursement of executives salaries and instead provided a payment to Monolith of 1% of the "C & A" Program expenditures, which 1% based on later amendments, would have amounted to $46,000. The contract was amended and Paragraph Nine thereafter read in part: "No salaries of contractor's executive officers * * * shall be included in the cost * * * of the Program, except that *direct expenses (including salaries) of Contractor's officers * * * in connection with * * * the Programs may be so included to the extent approved by Defense Corporation."* [Emphasis added.]

Thus, by the contract, there was never any intention to allocate all or any fixed portion of executives' salaries to the project, except direct expenses and direct salaries, and then only to the extent approved by D.P.C.

Monolith was a wholly owned subsidiary of the parent Company. Their executive officers were the same. When the project began, only one-third of the time of these executives was allocated to Monolith and two-thirds to the parent Company. By a resolution of the Board of Directors of Monolith and its parent Company in 1948, there was retroactively allocated 50% of the salaries of the executives to Monolith and 50% to the parent Company. Monolith then made claim against R.F.C. for two-thirds of the executives salaries allocated to Monolith, except when travelling, during which time Monolith charged the total amount of executives' salaries.[33]

32. See footnote No. 29.

33. Since the claim for executives salaries is largely the claim for Coy Burnett's salary, this breakdown may be helpful.

| Coy Burnett | Total salary (both Cos.) | Alloc. to Monolith (by action of the two Cos.) | Claimed agnst. R.F.C. by Monolith | Allowed by R.F.C. Findings. |
|---|---|---|---|---|
| 1943 | $60,000 | $30,000 | $28,000 | $24,000 |
| 1944 | 60,000 | 30,000 | 28,415.30 | 24,500 |
| 1945 | 60,000 | 30,000 | 22,410.96 | 1,250 |

R.F.C. allowed Burnett salary for one month in 1945 since the "M & O" fee (in lieu of salaries) became effective 2/1/45.

No records of executives' time were kept, but Coy Burnett testified to the scope of his activities. There was submitted to the court as Exhibits, compilations of telephone calls, telegrams and correspondence. Obviously Monolith's claim was only an estimate or an arbitrary allocation.

Coy Burnett was the principal shareholder of Monolith and received a salary of $60,000 per year plus bonuses from Monolith and the parent Company. Over a five year period from 1943 to 1947, the part of his salary allocated to Monolith, exclusive of his expense account, before taxes and before deducting his salary, amounted to 20% of the net profits of Monolith. The court does not pass upon the fairness of Burnett's salary in any manner, except to consider it as part of Monolith's claim against R.F.C. as a reimbursable. The salary was clearly exorbitant when claimed as a reimbursable particularly when compared with salaries paid to other Monolith executives. McBride, the Manager of the alumina project, originally received $3,000 per year and was later increased to $5,000 per year. Anderson, Manager of the Laramie Cement plant for Monolith, and one of the alleged inventors of the Monolith process, received about $305 per month in late 1942 and early 1943.

Monolith's activities at Laramie included the cement plant, the quarry, a coal mine, a small guage railroad and a ranch. But Monolith allocated two-thirds of President Burnett's salary to the project and one-third to the other business of Monolith, even though Monolith had Anderson as Manager of the cement plant and McBride as Manager of the Project on the ground at Laramie.

R.F.C. by its findings allowed for the executive salary of Coy Burnett, President of Monolith, the following:

| | |
|---|---:|
| For the year 1943 | $24,000 |
| For the year 1944 | 24,500 |
| For the year 1945 | 1,250 |
| | $49,750 |

It took into account that the "M & O" Program was put into effect by Monolith on February 1, 1945 and that Monolith thereafter claimed and was allowed the contract rates under the "M & O" Program at $6,000 per year for two full years to 2/1/47. It also considered the contract and the fact that $46,000 would have been the maximum on a 1% basis (which provision was however, later modified). It also took into account its practice in other D.P.C. projects, and the fact that at maximum production of 66 tons of alumina per day at $1.50 per ton, under the "M & O" Program, Monolith's annual "M & O" fee in lieu of salaries, would have totaled between $23,000 and $29,000 per year.

A further answer, and a short and conclusive one, is that the contract provided that direct expenses and salaries should be included "to the extent approved by Defense Corporation." No approval was ever given except as it may appear from the findings of R.F.C. Under familiar principles of contract law, Monolith received by the R.F.C. findings exactly what it bargained for.

No allowance was made for the claim for the salary of W. D. Burnett, Vice President. No showing was made before R.F.C. on the filing of the claim or in this court that he rendered any except nominal services.

Calkins, Secretary Treasurer died on July 13, 1944. Durfee, who had been Assistant Secretary Treasurer, during 1943 and 1944, then became Secretary Treasurer in his place. As to Durfee, the parent Company allocated to Monolith $1,152 for 1943, 37% of his $3,109 total

If any criticism is to be made of R.F.C. in connection with these findings, it is that R.F.C. was over generous in allowing $24,000 out of a total of $30,000 disbursed for or by Monolith in 1943, and $24,500 out of a total of $30,000 disbursed by or for Monolith in 1944. Since Mr. Burnett (for Monolith) was, during 1943–1944 also operating the Laramie cement plant, quarrie, railroad and ranch, it would appear that the allowances made by R.F.C. were adequate for his valuable services to the project.

salary from both companies; $1,750 for 1944, 50% of his $3,500 total salary, and $2,100 for 1945, 50% of his $4,200 total salary. Monolith set forth in its claim with R.F.C. the following amounts, and was allowed the following:

| Year | Salary alloc. to Monolith | Claimed by Monolith | Allowed by R.F.C. |
|------|------|------|------|
| 1943 | $1152.00 | $1036.19 | $777.14 |
| 1944 | 1750.00 | 1166.67 | 875.00 |
| 1945 | 2100.00 | 1400.00 | 87.51 |

The "M & O" fee (in lieu of salaries) went into effect 2/1/45. R.F.C.'s allowance was fair and reasonable.

Claim was made for $193.54, time allegedly devoted to the project in May to July 1946, by Kingsbury Burnett, the daughter of the President. Her title was Assistant to the President. The evidence showed that she was only his companion. Rejection of this item was proper.

### Direct expense—salary claim.

Monolith claims $95,262.61 for executive salaries under the direct expense program or shut down program beginning 7/26/46. Of this amount, $71,849.-67 is claimed for the services of Coy Burnett. Monolith's claim covers the period for 7/26/46 to 12/1/49.

§ 6(d) (iii) of the Settlement Act, 41 U.S.C.A. § 106(d) (iii) provides that there shall be disallowed "Expenses due to the negligence or willful failure of the contractor to discontinue with reasonable promptness the incurring of expenses after the effective date of the termination notice." In Benjamin Franklin Graphite Co. v. R. F. C. [1947] 2 App.Bd. OCS 117, the court held that "the expenses of the two year period during which appellant sought without success to purchase or lease the D.P.C. property are not allowable settlement expenses * * * They were not incurred in the preparation and presentation of appellant's termination claim nor were they reasonably necessary for the settlement of such claim. The ex-

penses incurred after the date of appeal must be disallowed even though settlement negotiations occurred after that date."

The effective date of the termination notice was October 14, 1946. R.F.C. authorized and permitted certain expenditures after that date, but only to the extent that these subsequent expenditures were authorized by R.F.C., may there be recovery for them. Prior to 6/26/47 Monolith was instructed to discontinue incurring expenses under this program. Figured to 7/1/47 Monolith claims for executive salaries amount to $25,797.70, of which $20,197.84 represents the claim for the salary of Coy Burnett. Clearly, expenditures after 6/26/47 (or for convenience 7/1/47) were not reimbursable.

As to the period from 6/26/46 to 7/1/47, in which $25,797.70 is claimed, it must be remembered the "M & O" fee of $6,000 per year was allowed for two years from 2/1/45 until 2/1/47 although the "M & O" Program terminated 10/14/46. There was no contract provision covering the shut down. Work was performed at R.F.C.'s request. Recovery for executives' salaries for this period would be determined under the Contract Settlement Act and would not exceed the reasonable value of the executives' salaries. No showing was made to this court of the services performed by the executives for such period. The record is bare except for the showing that salaries were paid. The exhibits containing correspondence etc., by Monolith show its activities were largely devoted to protesting the stop order and the termination notice and carrying on the law suit it had commenced on November 8, 1946.

Obviously carrying on the shut down program or direct expense program involved minor duties all within the capacity of McBride, General Manager of the alumina project. His salary was paid by the government during this period and is not in dispute.[34]

34. The salary of McBride and his staff was terminated effective 6/14/47 and salaries paid by D.P.C. to that date.

(Our Ex. N, p. 54; R.F.C. Ex. to its findings, E 17(3)).

The R.F.C. in allowing amounts on executive salaries considered the "C & A" and the direct expense program together and made "a reasonable allowance in the aggregate for all the executives' salaries claimed * * * taking into consideration the separate allowance by R.F.C. of the full minimum fee for the period of the "M & O" program (R.F.C. Findings, our Ex. N, p. 45).

Finally, the record shows that although Monolith was the prime contractor on the project, the plant was built by a subcontractor, Peter Kiewit & Sons, and the equipment was designed and installed by the Dorr Co. All of their bills were paid for by the government and no claim is here involved concerning them. Thus, Monolith's activities during the "C & A" Program were only those of general supervision.

 The R.F.C. in its findings went into the matter far more fully than the court does here,[35] and the court approves and adopts R.F.C.'s findings as to executives' salaries in toto.

3. "C & A" Program except Salaries and Interest.

The items in dispute have been heretofore enumerated:

*(a) Monolith L. A. Office payrolls:*

 Monolith claimed $25,749.60. It was allowed $23,904.98 in R.F.C. findings. Only two items remain in dispute: (1) The salary of a PBX operator amounting to $501.20. This was a normal expense of Monolith's Los Angeles Office and would have been incurred regardless of the project. It was not allowable under Paragraph Nine of the Contract. It was not a direct expense or a salary in connection with the Program.

The second item in dispute is the sum of $1,343.42 for the engineering department in the Los Angeles office. This was a portion of the salary paid to Ledyard,

Chemical Engineer of the parent Company's plant in California. It covered the period June 1, 1943 through December 31, 1944 plus $31.47 in the year 1945. Ledyard earned during the 19 months' period $6,175. The claim was thus between a fourth and fifth of Ledyard's salary. There was no evidence of time spent by Ledyard or record kept in connection with the project. Evidence showed that Ledyard went to the Laramie plant in 1946 to take over duties at the cement plant and release Anderson for alumina plant work. Thus, the claim on Ledyard's salary was properly rejected.

*(b) Payroll taxes:*

 Monolith claims $986.55. $613.-23 has been allowed, $373.32 is in dispute. This claim is based upon salaries or portions thereof which have been disallowed by the findings of R.F.C. and by this court. Accordingly, the $373.32 is not a proper claim.

*(c) Travel expense and expenses of the Washington office:*

Monolith claims $8,766.79; $7,030.13 has been allowed by R.F.C. findings. In dispute is $1,736.66. Of this sum $1,312.-50 involved an office maintained in Washington by Monolith for the period March 1943 to December 1944. This would not be a direct expense under Article Nine of the Contract. There was a resident engineer at the plant paid for by D.P.C. The Washington office was maintained for the convenience of Monolith. It was not a direct expense. R.F.C. has been generous in its findings. The remaining portion of the disputed amount, $424.16 was for a trip to Washington for Coy Burnett between March 15th and April 1, 1945. On that trip Burnett appeared before the U. S. Senate Small Business Committee in connection with its hearing on surplus property. This was not a proper claim under the contract. In addition, McBride, Manager of the

---

35. In this connection, the court states that it has minutely inspected the various findings and determinations made by R.F.C. and is impressed with the accurate and

painstaking manner in which the problems were discussed, evidence analysed and the findings made.

alumina project for Monolith went to Washington at the same time and his salary and expenses were allowed in the R.F.C. findings.

*(d) Miscellaneous expenses:*

One claim of $562.50 was disallowed. It has been stipulated this money was not expended by Monolith, but is a charge made for the rental of equipment. Monolith has offered no evidence on this point and R.F.C. has fully covered it in its findings and properly rejected it.

*(e) Land:*

■ A $200 item is in dispute. This money was expended by Monolith for options on 14,000 acres of land, and was apparently expended by Monolith in the anticipation and hope that D.P.C. would accept and adopt the option Instead D.P.C. rejected it. This was a speculative venture by Monolith far exceeding the reasonable needs of a test run and R.F.C. has no liability for the claim.

*(f) Test plant cost, excluding interest:*

■ The sum of $36,095.27 is claimed by Monolith. This amount was all expended prior to January 1, 1943 [36] except $3,094.27 which was expended between January and June 30, 1943. This cost was never included in the contract, although there were various revisions of it. Monolith still owns the test plant, has never tendered it to the government. Monolith still has its patents, for what they are worth, allegedly based on the test plant operations. R.F.C. considered the matter in detail in its findings and properly rejected the item.

4. The Direct Expense Program, excluding salaries and interest.

As heretofore stated, this covers the period after the stopwork order by R.F.C. on July 26, 1946 to June 27, 1947, when R.F.C. advised Monolith not to make further expenditures. The total items in dispute total $6,343.27.

*(a) Los Angeles Payroll:*

Monolith claimed $2,144.11. It was allowed $2,030.90. There is in dispute $113.21 for a PBX operator. What has been said about the previous PBX claim applies here. The item was properly rejected.

*(b) Los Angeles office payroll disbursed after June 26, 1947:*

■ $1,877.23 was claimed. None of it was allowed. Monolith had been instructed to cease incurring expenses. It has offered no evidence on this subject and the item was properly rejected.

*(c) Laramie payroll:*

■ Monolith claimed $9,879.15. R.F.C. in its findings allowed $9,199.04. $680.11 is in dispute. R.F.C. found that this sum was incurred in connection with litigation Monolith had instituted against the defendant, and rejection was proper.

*(d) Payroll taxes:*

Monolith claimed $752.97; was allowed $486.16. There is in dispute $266.81. These were payroll taxes on the Los Angeles and Laramie payrolls, (a), (b) and (c) heretofore considered and rejected. The payroll taxes on such items were properly rejected.

*(e) Expense accounts:*

Monolith claims $2,403.72. There was allowed the sum of $131.66, transporta-

---

36. The original contract was dated January 28, 1943. It made provision for prior expenditures. By the amendment of August 26, 1944, the original paragraph Nine (providing for 1% of the project costs in lieu of salaries) was stricken. The new paragraph Nine stated, "provided however, that any costs or expenses incurred since January 1, 1943, by or on behalf of contractor (Monolith) in anticipation of and prior to the execution of this agreement, which, if incurred after the execution of this agreement, would have been allowable hereunder, shall, *upon approval* by *Defense Corporation*, be paid direct by Defense Corporation or be reimbursed to contractor." [Emphasis added.]

The short answer is R.F.C. or D.P.C. never approved the January to June 30, 1943 expenditures. The major portion of the claim was for moneys expended in 1942.

tion and per diem on Coy Burnett on a three day trip, August 19, to 21, 1946. The amount rejected, $2,272.06, consisted of transportation and per diem for Coy Burnett and his daughter, Kingsbury Burnett. Her function as companion to her father has been heretofore mentioned. The expense claims rejected were for trips made in connection with the litigation which Monolith commenced against R.F.C. and not with the contract or its termination. The claims were properly rejected.

*(f) Office supplies and miscellaneous:*

 Monolith claims $1,500.70. R.F.C. by its findings allowed $366.85. $1,133.85 is in issue. Of this amount only $158.85 was actually expended by the plaintiff, but was expended after June 26, 1947 when the plaintiff had been instructed to cease incurring expenses. The balance, $975 was a charge made by Monolith for rental of equipment. $650 of this sum was for a period subsequent to June 26, 1947. The remaining $325 was for a period prior to June 26, 1947, but there was no provision in the contract for such a charge. It was not a direct expense under Paragraph Nine of the contract. R.F.C.'s finding is proper.

5. "M & O" Program, excluding interest.

Here the sum of $41,441.33 is in dispute.

*(a) Coy Burnett and Miss Burnett's expenses:*

Monolith claimed $265.64 of which $136.82 was allowed. In dispute $128.82, disbursed for transportation and per diem for Kingsbury Burnett. We have heretofore commented on her services to the project, and the claim was properly denied.

*(b) Supervision fee:*

Monolith claimed $29,000 as an "M & O" supervision fee. The contract provided for a minimum fee of $6,000 per year from the beginning of the "M & O" Program. This Program was instituted on February 1, 1945 and R.F.C. allowed $12,000 as an "M & O" fee for a two year period from February 1, 1945 to February 1, 1947. R.F.C. disallowed the balance of $17,000 which is in dispute.

In view of the stopwork order on July 24, 1946, and the notice of termination dated September 10, 1946, the contract ended on October 14, 1946. R.F.C. has been generous in allowing the "M & O" fee from that date on to February 1, 1947, which action was proper.

*(c) Laramie payroll and taxes after June 14, 1947:*

The sum of $16,396.17 was claimed by Monolith and disallowed. Monolith was notified, effective as of June 14, 1947, that the services of the Laramie personnel were no longer required. The claim was properly rejected.

*(d) Los Angeles payroll and taxes after July 31, 1947:*

There is claimed the sum of $419.34 and the item was rejected by R.F.C. It has been stipulated it was expended after July 31, 1947. Monolith was notified that effective July 31, 1947 the services of Monolith's Los Angeles office were no longer necessary in connection with the terminated "M & O" Program. R.F.C. so found and further found the services were not necessary as an incident to termination or settlement. The claim was properly disallowed.

*(e) Rent of office space after July 31, 1947:*

Monolith claims $5,014 and R.F.C. disallowed it. This covered a period after July 31, 1947. R.F.C. found that the use of the Los Angeles premises after July 31, 1947 was for storing records of the "M & O" Program, which occupied five legal sized cabinet drawers which R.F.C. was prevented from moving because of the injunction sought and obtained by Monolith in the prior litigation. The claim was properly rejected.

*(f) Rent of office machines after July 31, 1947:*

Monolith claims $2,436 and the claim was rejected by R.F.C. This money was not disbursed by Monolith, but was a rental charge and occurring after July 31, 1947, was properly rejected.

*(g) Typewriter service after October 14, 1946:*

The sum of $47 was claimed and was rejected. It was expended after October 14, 1946. This was the date of the termination of the contract. The money was expended on two typewriters owned by R.F.C. but located in Monolith's Los Angeles office. They were used almost exclusively for Monolith work and R.F.C. had been prevented from removing them by the injunction brought by Monolith. The claim was properly rejected.

Protection and maintenance,
excluding interest after
February 25, 1947.

Monolith claimed $19,653.59 which was rejected. On February 25, 1947 plaintiff obtained an injunction preventing the R.F.C. from disposing of the plant. This money was expended during the period after the date of the injunction. R.F.C. found that the expenditures were incurred in connection with, and as a result of the prior litigation and were not connected with termination and settlement of the contract. Monolith's injunction was dissolved on the ground it had not been entitled to it. The claim was not a proper reimbursable item.

In conclusion, R.F.C. allowed in excess of $109,000 for reimbursables. This amount is not contested. The R.F.C. findings are correct in not allowing the additional amounts claimed.

V.
R.F.C.'s COUNTERCLAIM.

By its findings issued 6/7/50, R.F.C. determined that Monolith was indebted to it in the sum of $460,229.26 plus interest at $25.22 per day from April 10, 1950.

On February 10, 1949, the court in the prior action ordered an injunction pending appeal, upon Monolith posting an injunction bond in the sum of $200,000. The injunction restrained R.F.C. from taking possession of the alumina plant. The bond was continued by the Ninth Circuit after its decision on appeal and was effective until April 10, 1950.

In the consideration of this problem, we have the findings made by R.F.C. and a "Stipulation re amounts claimed by R.F.C. in its counter claim" which covers most material facts, and breaks the amounts down for further consideration.

The background of the injunction in the prior action is as follows:

On February 25, 1947, Monolith pursuant to stipulation, obtained a restraining order issued without bond being required or given, restraining Monolith and R.F.C. from changing or interfering with the status quo or possession of the alumina plant or its equipment, restraining R.F.C. from ousting Monolith from the plant, and restraining R.F.C. from selling, transferring, conveying, encumbering or delivering the real or personal property of the plant or doing anything to pass to others, including governmental agencies, such powers. R.F.C. reserved the right to seek to be relieved from the order and Monolith reserved the right within 20 days after such an application, to move the court to keep the provisions of the order in full force and effect.

On May 21, 1947, R.F.C. served and filed an application to be relieved from the restraining order, and on June 9, 1947 Monolith served a motion to continue the order in effect. On September 26, 1947, the court made its order, granting Monolith's motion to continue the restraining order in effect, but did not provide for any security. On November 20, 1947, R.F.C. served a motion to vacate the restraining order or to require Monolith to give security. On January 2, 1948, R.F.C. filed its motion to dismiss. On January 28, 1948, the court in open court rendered its decision to dismiss, but did not indicate a ruling on R.F.C.'s motion to vacate the restraining order or to require security.

On January 25, 1949, the judgment of dismissal was entered but no action was taken on R.F.C.'s request to vacate the restraining order or require security.

On January 31, 1949, Monolith filed notice of appeal to the Court of Appeals for the Ninth Circuit. On February 10,

1949, the district court made an order granting an injunction during the pendency of the appeal, on condition Monolith post an undertaking in the sum of $200,000. It was posted forthwith.

On December 21, 1949, the judgment of the district court was affirmed by the Ninth Circuit and on January 12, 1950, the Ninth Circuit ordered the injunction to remain in effect during the pendency of Monolith's petition for writ of certiorari, and that the bond in the sum of $200,000 be the same as the one already posted, and not in addition thereto. On April 10, 1950, the Supreme Court denied the petition for writ of certiorari.

Thus, between February 25, 1947 and April 10, 1950, R.F.C. was restrained and enjoined from changing or interfering with the status quo or possession of the alumina plant or its equipment, and restrained from ousting Monolith from said plant. Between February 10, 1949 and April 10, 1950, an injunction bond executed by Monolith was in force and effect.

The injunction bond was issued pursuant to a court order of February 10, 1949 and was "conditioned to pay all costs and damages not exceeding the sum that may be adjudged against plaintiff and appellant (Monolith) on account of said appeal and on account of the issuance of the within injunction if the judgment appealed from is affirmed or the appeal dismissed." The bond on file in the clerk's office contains identical language.

Since the judgment of dismissal was affirmed, Monolith's liability was twofold, to pay all costs and damages, not exceeding the sum that may be adjudged against plaintiff and appellant (1) on account of said appeal and (2) on account of the issuance of said injunction. There is no issue involving the costs on appeal. We are concerned with the latter provision of the order and bond.

In view of the contention by Monolith that R.F.C. on its counter claim is limited to the amount of undertaking, to wit, $200,000 and to the period of time covered by the undertaking February 10, 1949 to April 10, 1950, a point which we discuss hereafter, the R.F.C. claim is broken down as follows:

| Item | Total Claimed | R.F.C. Claim Now Claimed | |
| | | Incurred 2/10/49 to 4/10/50 Period Bond in Effect | Incurred prior to 2/10/49 |
| --- | --- | --- | --- |
| A. Loss on Plant Investment | | | |
| (1) Depreciation | $218,555.00 [a] = 4% on 1,750,000 from 2/25/47 to 4/10/50 | $81,666.67 (same basis) | $137,083.33 (same basis) |
| (2) Interest | $109,275.00 [b] = 2% on 1,750,000 from 2/25/47 to 4/10/50 | $40,833.33 (same basis) | $68,541.67 (same basis) |
| B. Direct expenses in prot. plant | 81,945.43 | 28,774.96 | 53,170.47 |
| C. Litigation exp. (1) Attys. fees (2) Litig. exp. | 38,165.51 | 12,436.27 | 25,729.24 |

a. R.F.C. after trial recomputed its claim to be $218,750.

b. R.F.C. after trial recomputed this claim to be $109,375.

| | | | |
|---|---|---|---|
| (a) Engr. Consul. & witness fees | 1,756.75 | 222.75 | 1534.00 |
| (b) (same) exp. | 2,743.63 | 16.23 | 2727.40 |
| (c) Attys. fees | 4,265.53 | 849.39 | 3416.14 |
| Total | 8,765.91 | 1,088.37 | 7,677.54 |
| D. Int. on B & C | 3,522.41 | (considered hereafter in Pt. VI) | |
| | $460,229.26 c | $164,799.60 | $292,202.25 |

E. Int. on Mono's claim of $460,229.26 at 2% from 4/10/50 equaling $25.22 per day (considered hereafter in Pt. VI)

R.F.C.'s counter claim is in two counts. The first lists R.F.C.'s total claim of $460,229.20 as shown in the chart above. The second count alleges the issuance of the injunction bonds and their continued existence between 2/10/49 and 4/10/50. The second cause of counter claim therefore rests on the bond.[37] The surety on the bond has not been made a party to the action.[38]

■ The law is well settled that in the absence of an injunction bond, " * * * there may be no recovery of damages for the issuance of a temporary injunction even though it may have been granted without just cause." Benz v. Compania Naviera Hidalgo, S. A., 9 Cir., 1953, 205 F.2d 944, 948, citing numerous cases.

■ The federal rule provides that the amount of the bond ordinarily limits the recovery for the wrongful issuance of an injunction. International Ladies Garment Workers Union v. Donnelly Garment Co., 8 Cir., 1945, 147 F.2d 246, 253, certiorari denied 325 U.S. 852, 65 S.Ct. 1088, 89 L.Ed. 1972; United Motors Service, Inc., v. Tropic-Aire, 8 Cir., 57 F.2d 479, 483; See Russell v. Farley 1881, 105 U.S. 433, 437, 26 L.Ed. 1060; Meyers v. Block, 1886, 120 U.S. 206, 211, 7 S.Ct. 525, 30 L.Ed. 642; unless the injunction was obtained maliciously, Tenth Ward Road District No. 11 v. Texas & P. Ry. Co., 5 Cir., 1926, 12 F.2d 245, 247, 45 A.L.R. 1513. See Meyers v. Block, supra; United Motors Service, Inc., v. Tropic-Aire, supra.

■ An action for malicious prosecution requires allegations and proof that the proceeding was instituted maliciously and without probable cause, and was successfully terminated in favor of the present plaintiff.[39] There are no allegations of malice or of lack of probable cause in either count of R.F.C.'s counterclaim. R.F.C. concedes it does not state such a cause of action.

■ It logically follows that the monetary limits of the injunction bond are the limits of possible recovery. International Ladies Garment Workers Union v. Donnelly Garment Co., supra, 147 F.2d 253; United Motors Service v. Tropic-Aire, supra, 57 F.2d 483, and

c. R.F.C. after trial recomputed the total claim to be $460,524.26.

37. Rule 65(c) Rules of Civil Procedure, 28 U.S.C.A., dealing with security for injunctions, impliedly permits liability to be fixed by motion or independent action. A counterclaim is the equivalent of such an action.

38. The liability under the bond is joint and several. No question has been raised as to the absence of the surety. In any event R.F.C. could rightfully elect as to which of the two obligors it would proceed against.

39. We do not have to decide whether such an action is gauged by federal or state law. See Wheeler v. Nesbitt, 1860, 24 How. 544, 16 L.Ed. 765, and Stewart v. Sonneborn, 1878, 8 Otto 187, 25 L.Ed. 116, for the federal rule; and Eustace v. Dechter, 1938, 53 Cal.App.2d 726, 128 P.2d 367, and MacGruer v. Denivelle, 1931, 113 Cal.App. 49, 297 P. 633, for the California Rule.

878

that the damage claimed must have been suffered during the period when the injunction bond or undertaking was in effect. Houghton v. Meyer, 1907, 208 U.S. 149, 157, 160, 28 S.Ct. 234, 52 L.Ed. 432; See St. Louis Iron Mt. & So. R. Co., v. McKnight, 1917, 244 U.S. 368, 374, 37 S.Ct. 611, 61 L.Ed. 1200.

■ Attorneys' fees and legal expenses (other than court costs) spent by the injured party in resisting the injunction or otherwise, are not items for which recovery is permitted, under the Federal rule. Missouri, K & T Ry. Co. v. Elliott, 1902, 184 U.S. 530, 539–540, 22 S.Ct. 446, 46 L.Ed. 673; Tullock v. Mulvane, 1902, 184 U.S. 497, 511, 513, 22 S.Ct. 372, 46 L.Ed. 657; Oelrichs v. Spain, 1872, 15 Wall. 211, 230–231, 21 L.Ed. 43; Heiser v. Woodruff, 10 Cir., 1942, 128 P.2d 178, 180; International Ladies Garment Workers Union v. Donnelly Garment Co., supra, 147 F.2d 254; Sullivan v. Cartier, 9 Cir., 1906, 147 F. 222; Lindeberg v. Howard 9 Cir., 1906, 146 F. 467. These items are damnum absque injuria. International Ladies Garment Workers Union v. Donnelly Garment Co., supra, 147 F.2d 253.

R.F.C. concedes the general rules of law concerning injunction bonds, but contends it may have recovery under the theory of restitution. Citing 131 A.L.R. 878:

"It is thus conceivable that a person who has been wrongfully enjoined or restrained, and has no right to recover damages, because of the absence not only of malice on the part of the injunction plaintiff, but also of an injunction bond, or because of the inapplicability of the injunction bond to all or part of the damages sustained * * * may yet have a recovery on the theory of restitution, if the injunction plaintiff has been unjustly enriched

by the proceedings at the expense of the injunction defendant."

■ But the principle of restitution applies only where a "party received under the decree what he is asked to restore to the adverse party, upon its reversal." Tenth Ward Road District No. 11 v. Texas & P. Ry. Co., supra, 12 F.2d 247, and the "cause of action for restitution is a type of the broader cause of action for money had and received * * *." Atlantic Coast Line R. Co. v. State of Florida, 1935, 295 U.S. 301, 55 S.Ct. 713, 716, 79 L.Ed. 1451.

■ Under these authorities and the facts of this case no recovery may be had by R.F.C. on the theory of restitution. No benefit was received by Monolith which was in fact taken from R. F.C. There is no basis for the application of the equitable cause of action of money had and received.

Applying these rules to R.F.C.'s counter claim it becomes apparent that R.F.C.'s claim is good only on the second cause of action on the bond. As we compute the items the claim totals $164,799.60 (our chart supra).

In category C, the sums of $12,436.27 for attorneys' fees and $1,088.37 for litigation expense [40] are claimed for the period from 2/10/49 to 4/10/50, while the bond was in existence. Under the authorities above these amounts are not recoverable.

The items in category A—for loss on plant investment, consisting of depreciation and interest, and category B, involving direct expenses in protecting the plant from 2/10/49 to 4/10/50 remain for consideration.

### Depreciation.

R.F.C. claimed depreciation at 4% on the sum of $1,750,000. According to the court's computations, depreciation on this amount for the period of the bond,

---

40. The litigation expenses do not include items allowable as costs.

from 2/10/49 to 4/10/50 would be $81,-666.67.

R.F.C.'s findings show.

R.F.C.'s investment
in Alumina plant,
as of 2/25/47 $4,361,526
Cost of reproducing
plant, as of 2/25/47 5,491,000
Cost of reproducing
plant, as of 3/1/50 6,712,000

The findings determined there was a limited utilization value of the plant as an alumina plant, and that "its highest·and best economic use would be as a cement plant" and found its appraised market value as a cement plant, as of 2/25/47 was $1,750,000. The stipulation of the parties as to reimbursables agreed upon the reproduction costs of 2/25/47 and 3/1/50 as set forth in the R.F.C. findings.

Under the statute the findings are prima facie correct. We start with the premise therefore, that R.F.C. on competent evidence, found the appraised value of the plant for its best economic use as a cement plant, was on February 25, 1947, $1,750,000. No appraisal of any kind was offered by Monolith as to the value of the Laramie plant at any time, or for any particular purpose. No evidence has been offered to contradict the findings except the stipulations as to reproduction costs and further stipulations that the sale of the Kalunite alumina plant, Salt Lake City, brought only approximately 15.47% of its cost; that the sale of the Ancor Experimental plant, Harleyville, S. C. brought only 19.27% of its cost; and that the Columbia Metals Corp., alumina plant at Salem, Oregon, was leased to a private concern with an option for purchase for the sum of $250,000, or approximately 4.88% of its cost.

The court finds little evidentiary matter in the sale or lease of the other three alumina plants, or in the reproduction costs of the Laramie plant, and certainly not enough to overturn the presumption that R.F.C.'s findings were correct.

The court also finds from evidence offered that the Laramie alumina plant was reasonably susceptible to adaption as a cement plant. Throughout the entire period of the construction of the plant Monolith insisted upon the best possible construction and the best possible equipment. It must be remembered that Monolith, under the contract prior to termination, had an option to buy the plant. The court concludes that Monolith at all times had in mind the possibility of the acquisition of the alumina plant, constructed immediately adjacent to its cement plant, as an additional unit in its cement operations.

"The allowance of damages should rest on equitable principles, and, as a general rule, should be such damages only as were actually sustained by reason of the injunction, that is, such damages as are the actual, necessary, and proximate result of the injunction during the time it was operative". 43 C.J.S., Injunctions, § 309, page 1091.

"Damages for injury to, or depreciation in the value of, property, caused by the injunction, may be recovered," 43 C.J.S. Injunctions, § 315, page 1096. The only U. S. case we find helpful is Osage Oil & Refining Co., v. Chandler, 2 Cir., 1923, 287 F. 848, which however, involved personal property. See Yellen v. Fidelity & Casualty Co. of New York, 1931, 115 Cal.App. 434, 1 P.2d 1019, and Kitsap County Bank v. United States Fidelity & Guaranty Co., 1916, 90 Wash. 12, 155 P. 411.

Judged by logic and what we can derive from the above authorities, we find R.F.C. is entitled to damages for depreciation of the plant during the period of the injunction bond.

The R.F.C. findings adopted a 25 year life for the plant, in that it allowed depreciation at the rate of 4%. No evidence on this subject was offered, and the court must therefore approve the findings made by R.F.C.

Starting from the premises therefore, that the plant was reasonably worth $1,750,000 on 2/25/47 and that a rate of 4% per annum is a proper rate of depreciation, we would calculate depreciation at 4% on $1,750,000.00 for the period from 2/10/49 to 4/10/50, which for 1 year and 2 months would equal $81,667.67.

### Interest.

The parties have stipulated that the funds for the erection of the plant were borrowed by R.F.C. from the Treasury of the United States; that R.F.C. paid interest on the sums borrowed at 2% per annum and that during the period between 2/25/47 through 4/10/50, R.F.C. was indebted to the Treasurer of the United States in an amount exceeding $2,000,000 for monies used in the construction of the plant upon which R.F.C. paid interest at the rate of 2% per annum.

R.F.C. found that during the period from 2/27/47 to 4/10/50 R.F.C. was unable to dispose of the property or to derive any beneficial use therefrom. This was obviously true because of the injunction in effect.

By statute, R.F.C. was required to continuously survey and report surplus property, and this obligation was imposed on R.F.C. prior to 2/25/47 and continued throughout the entire period of the injunction. Surplus Property Act of 1944 [41] Federal Property and Administrative Services Act of 1949.[42]

R.F.C. findings based the rate of interest at 2% which is the amount R.F.C. paid the Treasurer of the United States and figured the interest on the value of $1,750,000 above referred to. It is clear that R.F.C.'s findings were correct and that R.F.C. is entitled to interest at 2% on $1,750,000 from 2/10/49 to 4/10/50, a total of $40,833.33.

### Direct expenses in protecting the plant.

By stipulation of the parties as shown in the chart above, R.F.C. expended $28,774.96 in expenses in connection with the plant between 2/10/49 and 4/10/50. The parties by their stipulation have broken this down as follows:

(1) Salaries & wages and payroll taxes:
| | |
|---|---|
| The Dorr Co. | $2,773.69 |
| R.F.C. Engineer | 8,049.69 |

(2) Power bills & interest thereon paid to Bureau of Reclamation — 1,405.14

(3) Supplies of coal, water, gasoline, etc. — 265.58

(4) Insurance-Liability, boiler, etc. — 148.46

(5) Telephone, telegraph and teletype — 676.07

(6) Office supplies, photostats, postage, stationery — 64.82

(7) Automobile exp., gasoline, repairs, etc. — 266.36

(8) Real estate taxes — 15,125.15

Total — $28,774.96

41. Act of October 3, 1944, 78th Congress, 2nd Session, c. 479, 58 Stat. 765 et seq. This statute was in effect through June 30, 1949. § 11 thereof required each owning agency (including wholly owned corporations of the United States) to continuously survey property in its control and determine which of such property was surplus; and to promptly report all such surplus property. § 19 required the Surplus Property Board, set up under the Act, to report to Congress within three months, certain specific classes of surplus property (not including any plants which cost the government less than $5,000,000) and listing specifically alumina plants and facilities. The Surplus Property Act of 1944 was formerly 50 U.S.C.A.Appendix, §§ 1611–1646.

42. Act of June 30, 1949, 81st Congress, 1st Session c. 288, 63 Stat. 377 et seq. This Act became effective July 1, 1949 and repealed the Surplus Property Act of 1944, except certain sections thereof not pertinent here. 69 Stat. 399. This statute, in § 202, required each executive agency (including wholly owned corporations of the United States) to continuously survey and promptly report surplus property. The statute now appears in c. 10 of Title 40 U.S.C.A. §§ 471 to 514.

A stipulation between the parties concedes the sums were paid by R.F.C. for the purposes indicated.

Our only inquiry is whether they are proper elements of damages. All expenses itemized above were incurred because the R.F.C. was, by the injunction, required to retain the title to the plant, prohibited from disposing of it and restrained from doing anything to pass power over the plant to others, including government agencies. The law required R.F.C. to continuously survey and report its surplus property. Surplus Property Act of 1944; Federal Property and Administrative Services Act of 1949. (supra).

It will be presumed that the law would have been obeyed and accordingly, between 2/25/47 and 2/10/49, the date of the beginning of the injunction bond, R.F.C. would have transferred, reported and declared the property as surplus. Thereafter, R.F.C. would have held only the bare legal title and "The responsibility and authority for disposing of the property and for its care and handling pending disposal * * * by the terms of the Surplus Property Act (were) vested in War Assets Administration * * *." U. S. v. Shofner Iron & Steel Works, supra, 168 F.2d page 287.

R.F.C. was restrained until 4/10/50 from disposing of the property or passing power to dispose of it to other governmental agencies. It declared the property surplus on 6/30/50 and submitted its detailed inventory and reports on 9/15/50.

 The inescapable conclusion is that these expenses were incurred and paid by R.F.C. because of the injunction during the period of the bond, and would not have been incurred and expended had it not been for the injunction during the period of the bond. They were proximately caused by the injunction. R.F.C. has found them to have been reasonable expenses by its findings and the parties have stipulated the amounts were actually paid. R.F.C. is entitled to recover on its counter claim on this item, $28,774.96.

Combining items of recovery on the counter claim, for the period 2/10/49 to 4/10/50, they are as follows:

| | | |
|---|---|---|
| A. 1. Depreciation | | $81,666.67 |
| 2. Interest | | 40,833.33 |
| B. Direct expense | | 28,774.96 |
| C. Litigation expense | | – |
| D. Int. on B & C thru 4/9/50 | considered infra, Pt.VI | |
| E. Int. at $25.22 (2%) on | | |
| R.F.C.'s claim | " " " | |
| | | $151,274.96 |

### License for slurry line.

Two minor matters not heretofore noted in connection with the counterclaim, remain. The first cause of action on the counterclaim alleged and the facts show, that an overhead conveyor was constructed at R.F.C.'s expense on Monolith's property, for use in moving the crushed ore from Monolith's crusher to the alumina plant, that an underground slurry line was installed at R.F.C.'s expense on Monolith's property to deliver the alumina plant's residue to Monolith's cement plant, and that Monolith has refused to convey to R.F.C. the necessary easements which it had agreed to furnish.

The overhead conveyor has been removed from the Monolith premises and R.F.C. concedes this issue is now moot.

As to the underground slurry line, Monolith has made no opposition to R.F.C.'s claim that the government is the owner of the slurry line between the alumina plant and the Monolith cement plant, and apparently does not contest R.F.C.'s right to an easement or license recognizing the government's title to the slurry line and its right to leave the slurry line on Monolith's property, with the right of removal at such time as the government may finally dispose of the alumina plant. R.F.C. is entitled to this relief.

### VI.

### INTEREST ON MONOLITH'S AND R.F.C.'S CLAIMS.

(1) Monolith's Claim for Interest.

We have heretofore excepted from consideration Monolith's claim for interest. As the claims were made to R.F.C.

they were based on a rate of 7% per annum from date of expenditure and totaled $137,384.34 plus an item of $2,057.25 interest on the capital cost of the test plant heretofore considered, making a total interest claim of $139,451.59.[43]

Monolith now withdraws any claim for interest at 7% and concedes that the proper rate is 2½% provided for in the Contract Settlement Act, § 6(f), 41 U.S.C.A. § 106(f).

The court has found that R.F.C.'s allowance of $109,322.49 was correct and hence any interest, if allowed, is to be calculated at the rate of 2½% per annum on that sum.

Period for which Interest runs.

*(a) Period prior to 4/10/50.*

§ 6(d) (6) of the Settlement Act, 41 U.S.C.A. § 106(d) (6) provides as an allowable item of cost "interest on the termination claim in accordance with subsection (f) of this section; * *." Subsection (f) provides that interest shall be paid " * * * for the period beginning thirty days after the date fixed for termination and ending with the date of final payment, except that (1) if the prime contractor unreasonably delays the settlement of his claim, interest shall not accrue for the period of such delay, * * *."

The notice of termination of Plancor 1844 was received by Monolith on September 14, 1946, and became effective thirty days thereafter. Consequently, the date of termination of this contract was October 14, 1946, and section 6(f) of the Settlement Act, 41 U.S.C.A. § 106(f) provides, under certain circumstances, for the payment of interest beginning thirty days thereafter.

Monolith, however, claimed that it should be paid interest from the date of expenditure, rather than from thirty days following termination. In its findings, R.F.C. disallowed all of the sums

claimed except $109,322.49, and of course, no interest would be due on the sums disallowed. R.F.C. found that no interest was due on the allowed sums, at least prior to August 26, 1944, because it was not until that date that the contract was amended to provide for reimbursement of such expenditures.

R.F.C. further found that no interest could have accrued on the allowable items in Monolith's termination claim because, until the filing of the termination claim they had never been properly billed and substantiated. Not having been properly billed and substantiated, there was no obligation on R.F.C.'s part to pay them and therefore no interest could have accrued. Monolith introduced no evidence whatsoever to refute these findings.

§ 6(f) of the Settlement Act, 41 U.S.C.A. § 106(f) as above set forth, provides for the payment of interest starting thirty days after termination of the contract. R.F.C. disallowed interest for any period prior to April 10, 1950. Its reason for doing so was that the Settlement Act in section 6(f), 41 U.S.C.A. § 106(f), specifically prohibits the payment of interest for any period during which the contractor delays settlement.

"if the prime contractor unreasonably delays the settlement of his claim, interest shall not accrue for the period of such delay. * * *"

R.F.C. found that the institution of the prior litigation and the failure to file a termination claim until January 18, 1950, and the insistence after filing, and until certiorari was denied on April 10, 1950, that plaintiff was not required to proceed under the Contract Settlement Act, constituted an "unreasonable delay" within the meaning of this provision of section 6(f).

R.F.C. was correct and was supported by the decision of the Appeal Board in Benjamin Franklin Graphite Co. v. R.F.C., 2 Appeal Board OCS 117 (1947).

---

**43.** On Monolith's continued claims, carried down through Dec. 31, 1952, Monolith claims interest in the sum of $283,490.34 computed at 7% *or* $101,246.56 computed at 2½% on alleged total expenditures to December 31, 1952, of $891,697.57.

█ The institution of the prior litigation by Monolith was just as much or more of an "unreasonable delay" as the negotiations conducted by the contractor in Benjamin Franklin Graphite Co. (supra).

Monolith is not entitled to interest prior to 4/10/50.

### (b) Period 4/10/50 to Final Judgment in this action.

On June 7, 1950, R.F.C. issued its Findings on the termination claim submitted by Monolith. On June 16, 1950, plaintiff instituted this action appealing from R.F.C.'s determination as to the sums due on the termination claim. § 6(f) of the Settlement Act, 41 U.S.C.A. § 106(f), provides in part:

"(3) if after delivery of findings by a contracting agency, the contractor appeals or sues as provided in section 113 of this title, interest shall not accrue after the thirtieth day following the delivery of the findings on any amount allowed by such findings, unless such amount is increased upon such appeal or suit."

█ It is true the amount allowed by R.F.C. in its findings on Monolith's claim, $109,322.49 has not been increased by our decision in this action. But the counter claim or offset claim of R.F.C. has been materially decreased. It seems logical and fair we treat the claims together, since each in part offsets the other.

We think the intent of Congress in passing § 6(f)(3) of the Settlement Act, 41 U.S.C.A. § 106(f) (3) was to provide that interest should not be allowed unless the claimant appealing to the Appeal Board or a court, gained something by the appeal. Monolith did gain something by this appeal, although in a negative manner. It substantially cut its gross liability to R.F.C.

One further question on interest remains for consideration. Section 13(c) (3) of the Settlement Act, 41 U.S.C.A. § 113(c) (3), provides in part:

"Whenever the Appeal Board or court finds that the war contractor failed to negotiate in good faith with the contracting agency for the settlement of his claim or part thereof before appeal or suit thereon, * * * the Appeal Board or court * * * (ii) *may* deny interest on the claim or part thereof for such period as it deems proper; * * *." [Emphasis added.]

We find that Monolith did not negotiate for settlement in good faith. Even after certiorari was denied in the prior action and the first meeting of negotiators took place on 4/24/50, and in subsequent meetings, Monolith was still pressing it's claim for breach of contract and refusing to discuss settlement on the basis of reimbursibles. It continued to press its breach of contract theory in its complaint filed here and throughout this litigation.

█ But the section quoted uses the word "may" with reference to denial of interest. The court therefore in the exercise of discretion refuses to deny Monolith interest on its claim.

Monolith is therefore allowed interest from 4/10/50 to the date of judgment herein, or 2½% per annum on $109,322.-49 amounting to $7.59 per day.[44]

44. All computations of interest, both on Monolith's claim and the counterclaim of R.F.C., have been made by the court on a basis of a 360 day year. At the time R.F.C. made its findings it found that Monolith was entitled to interest on its claim allowed by R.F.C., in the sum of $7.49 per day. [Findings and determinations dated June 7, 1950, Par. III]

Since that time R.F.C. has ascertained that this calculation of $7.49 per day was based upon a 365 day period. To make the calculations uniform in their application to both Monolith's claim and the R.F.C. counterclaim, the use of a 360 day period increases the interest on the Monolith claim from $7.49 to $7.59 per day.

The $8.40 per day allowed on the R.F.C. counterclaim is likewise computed on a 360 day year.

### (2) R.F.C.'s claim for Interest.

#### (a) Interest to 4/10/50.

R.F.C. claims an item of $3,522.41 (category D, supra) being interest on the direct expenses (category B above) and the litigation expenses (category C above) from the date they were incurred *through April 9, 1950*, at the rate of 2% per annum. The 2% rate was the rate R.F.C. was paying on money borrowed from the Treasurer of the United States. However, R.F.C.'s computations of $3,522.41 for interest is based upon its original claims of $81,945.43 for direct expenses and $46,931.42 for its legal and litigation expenses covering the entire period of the injunction. It will be noted in the Chart set forth above, that the two items in category C under litigation expense, namely $38,165.51 and $8,765.91 make this total of $46,931.42.

But this court has found that R.F.C. is only entitled to $28,774.96 for its direct expenses between 2/10/49 and 4/10/50 while the bond was in effect and not entitled to litigation expenses, (category C). Although the record shows the individual items that make up the total of the $28,774.96 direct expense items, the record does not show the date the expenditures were incurred, except as between 2/10/49 and 4/10/50. Consequently, it will be impossible to allow any interest on these items prior to 4/10/50.

#### (b) Interest after 4/10/50.

The R.F.C. findings (our Ex. N, R. F.C. findings Ex. F, Par. d, page 61) allowed R.F.C. interest from 4/10/50 in the amount of $25.22 per day calculated at 2% per annum on the total claim of R.F.C. of $460,229.26. The court has now found that R.F.C.'s correct claim is $151,274.96 as of 4/10/50.

No attack has been made by Monolith on the allowance of interest on the R.F. C. claim and the rate of interest was fixed at 2% per annum. Obviously R.F. C. computed this rate of interest at the same rate on which it was paying interest to the Treasurer of the United States on money borrowed.

It appears proper therefore, that R.F. C.'s claim should bear interest at the rate of 2% per annum from April 10, 1950 to the date of entry of judgment herein. The court computes this to be at the rate of $8.40 per day.[44]

### VII.
### CONCLUSION.

Monolith is entitled to recover in this proceeding the sum of $109,322.49 with interest at 2½% on said amount from 4/10/50, amounting to $7.59 per day, to date of entry of judgment herein.

R.F.C. is entitled to recover in this proceeding the sum of $151,274.96 with interest at 2% on said amount from 4/10/50, amounting to $8.40 per day, to date of entry of judgment herein.

R.F.C. is entitled to a license or easement covering the slurry lines.

The total amounts due the respective parties as of the date of entry of judgment shall be offset and a judgment entered for R.F.C. in the amount so ascertained.

As to costs, it appears that Monolith has failed in its case made by the complaint but did prevail in substantially reducing R.F.C.'s counter claim. However, 99% of the case concerned Monolith's complaint. The case involving the counter claim could have been tried in one day. Accordingly, the court determines that each side shall bear its own costs.

R.F.C. will prepare findings of fact, conclusions of law and judgment and interest computation to a fixed date, pursuant to the rules of this court.

---

44. See Note on page 883.